# In the United States Court of Federal Claims

No. 22-560C
(Filed Under Seal: August 18, 2022)
(Reissued for Publication: September 1, 2022)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MANAGEMENT & TRAINING CORPORATION, | * <br> * <br> * |
|       Plaintiff, | * <br> * |
| v. | * <br> * |
| THE UNITED STATES, | * <br> * <br> * |
|       Defendant | * <br> * <br> * |
| and | * <br> * |
| ODLE MANAGEMENT GROUP, LLC, | * <br> * |
|       Defendant-Intervenor. | * |

Postaward Bid Protest; Operation of a Job Corps Center; Cross-Motions for Judgment on the Administrative Record; Evaluation of Proposals; Relevance of Past Performance; Subcontractor Past Performance; Unequal Treatment; Price Realism; Professional Employee Compensation, FAR 52.222-46; Best Value Determination; Permanent Injunction

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Alex P. Hontos, Minneapolis, MN, for plaintiff.

Bret R. Vallacher, United States Department of Justice, Washington, DC, for defendant.

John E. McCarthy, Jr., Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this postaward bid protest, plaintiff Management & Training Corporation ("MTC") challenges the award of a contract to operate a Job Corps center by the United States Department of Labor ("Department of Labor") to defendant-intervenor Odle Management Group, LLC ("Odle"). Specifically, MTC contends that the Department of Labor improperly evaluated proposals in several respects and then made a flawed best value determination. Before the court are the parties' cross-motions for judgment on the administrative record. As explained below,

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on August 31, 2022. The redactions are indicated with bracketed ellipses ("[. . .]").

the court grants in part and denies in part each motion and enters a permanent injunction requiring the Department of Labor to reevaluate the proposals.

# I. BACKGROUND

"Job Corps is a national residential training and employment program administered by the U.S. Department of Labor to address the multiple barriers to employment faced by disadvantaged youth throughout the United States."  Admin. R. ("AR") 182.  It "provides comprehensive career development services to students including academic, career technical, career success and independent living skills, career readiness training, and support services," and "is intended to prepare youth to obtain and hold gainful employment, pursue further education or training, or satisfy entrance requirements for careers in the Armed Forces."  Id.

## A. Solicitation

On March 11, 2021, the Department of Labor issued a solicitation for proposals to operate the Turner Job Corps Center in Albany, Georgia.  Id. at 173-74.  In particular, it sought a contractor to (1) operate the center for a planned on-board strength ("OBS") of 732 students, id. at 176, 184; (2) handle Outreach and Admissions to ensure that a minimum of 660 students arrived at the center each year and that the center operated at 100% of its planned OBS,[1] id. at 176, 184-85; and (3) provide Career Transition Services for all program graduates and former program enrollees, id. at 176, 186.[2]  Accord id. at 3116 (indicating, in the Source Selection Plan, that proposals would "pertain[] to the operation of the Turner Job Corps Center and Outreach & Admissions and Career Transition Services").  The contractor would be required to comply with the provisions of the Workforce Innovation and Opportunity Act and its implementing regulations, as well as with the Department of Labor's Policy and Requirements Handbook, which was incorporated by reference into the contract.  Id. at 182.

---

[1]  The Department of Labor indicated that another contractor—Atlanta Outreach and Admissions—was obligated to send 660 students per year to the Turner Job Corps Center.  AR 184.  Nevertheless, the Turner Job Corps Center contractor remained responsible for operating the center at 100% of its OBS of 732.  Id. at 176, 185, 191.  Specifically, offerors were advised:

> [T]he requirement to operate the Center at 100% OBS . . . applies independently of the annual arrivals requirements . . . and arrivals anticipated from third party Outreach and Admissions contractors.  The Contractor is required to deliver enrollees at higher numbers than specified here if that is necessary to attain and/or maintain full capacity (100% OBS) at the Center they are operating.

Id. at 191; accord id. at 185.

[2]  The Department of Labor also planned to "place service orders for services and equipment," AR 198, under three cost-reimbursement contract line items, id. at 177-80.  These contract line items are not at issue in this protest.

The Department of Labor intended to award a contract with a base period of two years and three one-year option periods.  Id. at 177.  The center operations contract line item would be awarded on a fixed-price-with-a-price-adjustment basis (with downward adjustments for months when the OBS was less than 100% of the planned OBS), while the Outreach and Admissions and Career Transition Services contract line items would be awarded on a firm-fixed-price basis.  Id. at 177-80.  The contract would also contain line items for phase-in and phase-out, if either were necessary, and a 1% management fee.  Id. at 177-81.

### 1.  Proposal Requirements

In section L of the solicitation, the Department of Labor advised offerors that their proposals should include five sections.  Id. at 247.  The Technical Approach section was to address five topics:  Career Pathways; Counseling, Placement, and Support; Relationships with Community; Safety and Security; and Outreach and Admissions.  Id. at 249.  Of particular importance in this protest was Outreach and Admissions; the Department of Labor provided the following instruction for this topic:  "Describe your strategies, methods, and relationships that you have or will develop to promote a positive image of the program as well as lead to enrollment of a sufficient number of enrollees for the Job Corps center to operate at full OBS." Id. at 249-50.

In the Past Performance section,[3] offerors were to "identify those projects which they believe[d were] relevant and should be considered by [the Department of Labor] . . . ."  Id. at 250.  The "work under the identified projects [was to be] similar in size, scope, and complexity to the requirements of [the Turner Job Corps Center] solicitation," with "size" defined as "dollar value or center OBS," "scope" defined as "type of work and the nature of the activities performed," and "complexity" defined as "performance challenges and risks."  Id. Offerors were permitted to "identify projects they performed as the prime, as well as projects performed by subcontractors that [would] perform major or critical aspects of the requirement." Id. at 251.

In the Staff Resources section of their proposals, offerors were to supply organizational and staffing charts, describe their approach to staffing the center, and address the corporate resources that would be devoted to center operations.  Id. at 251-52.  The proposal section devoted to financial matters—the Business Management Proposal—was to include, among other information, the offerors' proposed prices for each contract line item.  Id. at 252.  It was also to include a Professional Staff Compensation Plan and supporting information in accordance with Federal Acquisition Regulation ("FAR") 52.222-46, id., which was (twice) incorporated into the solicitation by reference, id. at 222, 244.  Finally, the Phase-In and Phase-Out section of the offerors' proposals was to indicate "the period of time required for each action, staff requirements, and major steps to be accomplished during these periods."  Id. at 255.

---

[3]  The Department of Labor formally labels this section, and the associated evaluation factor, as "Demonstrated Record of Effectiveness (Past Performance)," but otherwise uses the term "Past Performance" when addressing the section and factor.  For simplicity, the court will also use the term "Past Performance."

## 2.  Evaluation and Award Criteria

As set forth in section M of the solicitation, the Department of Labor stated its intent to evaluate proposals on the following five factors, listed "in descending order of importance": Technical Approach, Past Performance, Staff Resources, Price, and Phase-In and Phase-Out.  Id. at 257.  Technical Approach was divided into five subfactors that corresponded with the five topics the offerors were required to address:  Career Pathways; Counseling, Placement, and Support; Relationships with Community; Safety and Security; and Outreach and Admissions.  Id. at 257-58.  The subfactors were "relatively equal in importance to each other in the overall Technical Approach evaluation."  Id. at 258.

With respect to the Past Performance factor, the Department of Labor's "evaluation [would] include consideration of the quality of each offeror's past performance, if any, operating or providing activities at a Job Corps center or similar facility . . . ."  Id.  The Department of Labor advised that "[o]nly those projects deemed relevant will be considered in the evaluation of past performance" and that "[p]rojects found not to be similar in scope, size or complexity . . . [would] not be considered."  Id.  It further provided:

> The Government will consider Past Performance information for the entity proposed as the prime contractor, as well as information for proposed subcontractors that will perform major or critical aspects of the requirement, when such information is relevant to this procurement.  However, greater emphasis may be placed on the past performance of the prime contractor.

Id. at 259.  Finally, it indicated that "an offeror without a record of relevant past performance [would] not be evaluated favorably or unfavorably," but instead would "receive a Neutral rating."  Id.

For the Staff Resources factor, the Department of Labor planned to assess the proposals using three subfactors:  Organizational and Staffing Charts, Staff Schedules, and Corporate Oversight and Capacity.  Id.  Further, for the Price factor, the agency would "conduct a price analysis to assess whether the contract price proposed is fair and reasonable."  Id.  It also stated: "The Professional Staff Compensation Plan[s] will be evaluated such that plans indicating unrealistically low professional employee compensation may be assessed adversely as one of the factors considered in making an award."  Id. at 260.  Finally, "[t]he Phase-In and Phase-Out plans [would] be evaluated on a pass/fail basis."  Id.

The Department of Labor indicated that it would award the contract to the offeror whose proposal represented the best value to the government.  Id.  The importance of each factor to the best value determination was described in the following manner:

> Technical Approach is more important than Demonstrated Record of Effectiveness (Past Performance), which is more important than Staff Resources, which is more important than Price.  Phase-In and Phase-Out Plans will be evaluated on a pass/fail basis and offerors whose Phase-In and/or Phase-Out Plans are found to have failed will not be eligible for award.  Technical Approach,

Demonstrated Record of Effectiveness (Past Performance), and Staff Resources, when combined are significantly more important than Price.

Id.

## B. Evaluation of Proposals

Proposals were due by April 30, 2021.  Id. at 2138.  Six offerors timely submitted proposals:  MTC, the incumbent contractor; Odle; [. . .]; [. . .]; [. . .]; and [. . .].  Id. at 3179-80.  The proposals were evaluated on each factor identified in the solicitation, and the Source Selection Authority described the results of those evaluations in her Business Clearance Memorandum.

## 1. Technical Factors

For the Technical Approach and Staff Resources factors and subfactors, the technical evaluators identified the strengths, weaknesses, significant weaknesses, and deficiencies of each proposal using the following definitions:

- STRENGTH:  Any aspect of a proposal that, when properly evaluated, enhances the merit of the proposal or increases the probability of successful performance of the contract.

- WEAKNESS:  A flaw in the proposal that increases the risk of unsuccessful contract performance.

- SIGNIFICANT WEAKNESS:  A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance.

- DEFICIENCY:  A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

Id. at 2929, 3151.  As summarized by the Source Selection Authority:

For Technical Approach Factor 1, . . . [. . .] had eight strengths and no weaknesses.  [. . .] had eight strengths and no weaknesses.  MTC had six strengths and no weaknesses.  Odle had ten strengths and one weakness.  [. . .] had five strengths and one weakness.  [. . .] had six strengths and two weaknesses.  There were no significant weaknesses or deficiencies identified in any of the six offerors['] proposals for Technical Approach.

. . . .

For Staff Resources Factor 3, [. . .] had no strengths and two weaknesses. [. . .] had no strengths or weaknesses.  MTC had no strengths or weaknesses. Odle had no strengths or weaknesses.  [. . .] had one strength and no weaknesses. [. . .] had no strengths or weaknesses, but two significant weaknesses.  None of the offerors received deficiencies for Staff Resources.

Id. at 3233.

The technical evaluators then, for each proposal, assigned adjectival ratings for the Technical Approach and Staff Resources factors and subfactors using the following definitions:

- OUTSTANDING:  Exceeds the specified requirements of the solicitation in a significantly beneficial way to the Government.  Proposal reflects no weaknesses, significant weaknesses, or deficiencies.  The proposal presents a very high probability of successful performance, shows a thorough understanding of the requirement and offers numerous strengths.  Overall, there is a very low degree of risk in meeting the Government's requirements.

- VERY GOOD:  Meets all and exceeds many of the specified requirements of the solicitation in a significantly beneficial way to the Government.  Proposal reflects no significant weaknesses, or deficiencies.  The proposal presents a high probability of successful performance, shows an understanding of the requirement and has at least one strength.  Overall, there is a low degree of risk in meeting the Government's requirements.

- ACCEPTABLE:  Meets the specified requirements of the solicitation.  Any strengths in the proposal are few in number and are not of significant benefit to the government and no deficiencies exist.  The proposal shows an understanding of the requirement and the strengths outweigh the weaknesses which presents the probability of successful performance.  Overall, there is a moderate degree of risk in meeting the Government's requirements.

- MARGINAL:  Minimally meets the requirements of the solicitation and there are one or more significant weaknesses.  Significant weaknesses are correctable without major revisions to the proposal.  Any strengths in the proposal are few in number and are outweighed by the presence of the significant weaknesses.  Overall, there is a high degree of risk in meeting the Government's requirements.  No deficiencies may exist.

- UNACCEPTABLE:  Fails to meet the requirements of the solicitation. The proposal contains a major error(s), omission(s) or deficiency(ies) that indicates a lack of understanding of the problem or an approach that cannot be expected to meet requirements.  Overall, there is a very high degree of risk in meeting the Government's requirements and none of these conditions can be corrected without major rewrite or revision of the proposal.

Id. at 2926-97, 3150.  All six proposals were rated as Acceptable for the Technical Approach factor and received, with a few exceptions, Acceptable ratings for each subfactor.[4]  Id. at 3184, 3188, 3193, 3196, 3201, 3204.  Four proposals—those submitted by [. . .], MTC, Odle, and [. . .]—were rated as Acceptable for the Staff Resources factor and received Acceptable ratings for each subfactor.  Id. at 3191, 3195, 3200, 3203.  The proposals of [. . .] and [. . .], in contrast, were rated Marginal on this factor, with either Marginal or Acceptable ratings for each subfactor.  Id. at 3187, 3207.

For the final factor assessed by the technical evaluators, Phase-In and Phase-Out, all six offerors received a Pass rating for their proposals.  Id. at 3188, 3192, 3196, 3200, 3204, 3208.

## 2.  Past Performance

With respect to the Past Performance factor, the evaluators first described the criteria used to determine the relevance of the offerors' identified projects:[5]

1)  The OBS is 732 which was used to determine the size.

2)  The scope is Center Operations with Outreach and Admissions and Career Transition Services.  Therefore, the scope is considered to be relevant when the offeror performed as the prime operator of a contract servicing a Center with Operations, Outreach and Admissions and Career Transition Services.

---

[4]  [. . .]'s proposal received a Very Good rating for the Career Pathways subfactor; [. . .]'s and [. . .]'s proposals received a Very Good rating for the Counseling, Placement, and Support subfactor; and [. . .]'s, MTC's, and Odle's proposals received a Very Good rating for the Safety and Security subfactor.  AR 3184, 3188, 3193, 3196, 3201, 3204.

[5]  It is unclear from the administrative record who initially evaluated the offerors' past performance.  The Source Selection Plan indicates that there was a "past performance evaluation team," AR 3131, and that the Source Selection Evaluation Board would review past performance information, id. at 3126, but neither the Technical Evaluation Consensus Report nor the portion of the administrative record labeled as the "Past Performance Evaluation" includes an evaluation of past performance, see id. at 3137 to 3148.12 (including past performance data in charts, spreadsheets, and tables, but no analysis of that data or any indication of who compiled that data), 3149-75 (Technical Evaluation Consensus Report).  Moreover, the summary of the Past Performance factor evaluation included in the Source Selection Authority's Business Clearance Memorandum does not indicate who performed the evaluation.  See id. at 3209-27.  During oral argument, defendant described the past performance evaluation process and identified the individuals who performed various steps of the evaluation but did not, as the court requested, indicate where in the administrative record that information was located.  See Oral Argument at 48:54-51:56.  Rather, defendant referred the court to the portion of the administrative record labeled as the "Past Performance Evaluation" and the Source Selection Authority's Business Clearance Memorandum.  See id. (citing AR 3137-48, 3211-27).

3)  The complexity was set forth within the Statement of Work (SOW) outlining the performance requirements of Center Operations with Outreach and Admissions and Career Transition Services.  Therefore, an offeror who has demonstrated through contracted performance the ability to manage the challenges and risks identified in the SOW were considered to be relevant. [sic]

Id. at 3209.  For each offeror, the evaluators provided a brief narrative addressing the relevance of the offerors' prior Job Corps center contracts—both those identified by the offerors and those identified by the evaluators.  Compare id. at 2192-95 ([. . .] proposal identifying [. . .] contracts), 2466-68 (MTC proposal identifying twenty-six contracts), 2699 (Odle proposal identifying nine contracts), with id. at 3211-13 (evaluators listing fourteen "projects" for [. . .]), 3217-19 (evaluators listing eighteen "projects" for MTC), 3221-22 (evaluators listing eleven "projects" for Odle).  These narratives included the following language regarding scope that was broader than the already-stated scope criteria:  "Relevant projects consist of operations on Center that included Outreach and Admissions & Career Transition Services, stand-alone OA/CTS and Center-only contracts."  Id. at 3211, 3214, 3216, 3220, 3223-24.  In addition, each narrative included a brief mention of the size of the other Jobs Corps center contracts associated with the offeror:

- "The Turner OBS is 732.  The centers['] OBS . . . for [. . .] range from [. . .] to [. . .] and are, therefore, relevant."  Id. at 3211.

- "The Turner OBS is 732.  The centers['] OBS . . . for [. . .] range from [. . .] to [. . .] and are, therefore, relevant."  Id. at 3214.

- "The Turner OBS is 732.  The centers['] OBS . . . for MTC range from [. . .] to [. . .] and are, therefore, relevant."  Id. at 3216.

- "The Turner OBS is 732.  The centers['] OBS . . . for Odle range from [. . .] to [. . .] and are, therefore, relevant."  Id. at 3220.

- "The Turner OBS is 732.  The centers['] OBS . . . for [. . .] range from [. . .] to [. . .] and are, therefore, relevant.  The remaining contracts were OA/CTS and were considered relevant."  Id. at 3223.

- "The Turner OBS is 732.  The centers['] OBS . . . for [. . .] range from [. . .] to [. . .] and are, therefore, relevant."  Id. at 3224.

Following each relevance-related narrative, the evaluators provided a one-paragraph summary of their assessment of the offeror's past performance that included an adjectival rating; the ratings were defined as follows:

| Exceptional/Very Low Performance Risk | Based on the offeror's performance record, no doubt exists that the offeror will successfully perform the required effort. |
|---|---|
| Very Good/Low Performance Risk | Based on the offeror's performance record, little doubt exists that the offeror will successfully perform the required effort. |
| Satisfactory/Moderate Performance Risk | Based on the offeror's performance record, some doubt exists that the offeror will successfully perform the required effort.  Normal contractor emphasis should preclude any problems. |
| Marginal/High Performance Risk | Based on the offeror's performance record, substantial doubt exists that the offeror will successfully perform the required effort. |
| Unsatisfactory/Very High Performance Risk | Based on the offeror's performance record, extreme doubt exists that the offeror will successfully perform the required effort. |
| Neutral/Unknown Performance Risk | No past performance record exists/no performance record is identifiable. |

Id. at 3210.  The summary paragraph for each offeror was identical (except for the name of the offeror):

> As required, [the offeror] identified past or current projects that demonstrate records of effectiveness and relevant work experience within the past three (3) years.  The relevant past performance and experience during the past three years for the Job Corps contracts performed by [the offeror] have been reviewed and evaluated in accordance with the evaluation instructions of the solicitation.  Based on [the offeror]'s overall performance record, some doubt exists that [the offeror] will successfully perform the required effort.  Therefore, the overall rating is SATISFACTORY.

Id. at 3211, 3214, 3216, 3220, 3223, 3225.

After each narrative, the evaluators presented a table showing the "CPARS ratings" for the offeror's "relevant projects."[6]  Id. at 3211-15, 3217-19, 3221-22, 3224-26.  The tables of "relevant projects" included fourteen projects for [. . .], id. at 3211-13; six projects for [. . .], id. at 3214-15; eighteen projects for MTC, id. at 3217-19; eleven projects for Odle, id. at 3221-22; three projects for [. . .], id. at 3224; and nine projects for [. . .], id. at 3225-26.  All but three of these projects were associated with a particular Job Corps center; for MTC, Odle, and [. . .], there was one project identified only as an "IDIQ contract" with no associated OBS.  Id. at 3219, 3222, 3226.

---

[6]  "CPARS" refers to the Contractor Performance Assessment Reporting System.  AR 251.

After each table, the evaluators described any Letters of Concern received by the offerors and indicated whether the offerors were the subject of an Office of Inspector General report. Specifically, they indicated that each offeror had [. . .] except [. . .], which had none.  Id. at 3213-16, 3219-20, 3222-24, 3226-27.  They also indicated that [. . .].  Id. at 3214, 3216, 3220, 3223, 3224, 3227.

Finally, the evaluators did not discuss past performance information for any of the offerors' subcontractors.  See id. at 3209-27.  Of particular importance in this protest, Odle proposed a subcontractor to perform the Outreach and Admissions portion of the contract.  Id. at 2695.  Specifically, it stated:

> ODLE has chosen Paxen as our subcontractor to perform Outreach and Admissions services, [. . .].  Paxen . . . [. . .].  Paxen has been the [. . .].  This partnership [. . .]. [sic]

Id.

### 3. Price

Two components of the evaluation of the final factor—Price—are relevant to this protest.[7]  First, the evaluators "conducted a price analysis to assess whether the contract price proposed [was] fair and reasonable."  Id. at 3227.  They compared the offerors' proposed prices, both with and without the HUBZone price evaluation preference to which one offeror was entitled.[8]  Id. at 3227-28.  The evaluators used the following prices in their comparisons:

---

[7]  It is unclear from the administrative record who initially evaluated the offerors' Business Management Proposals.  The Source Selection Plan indicates that there was a Price Analysis Team, AR 3122, 3127, 3133; that the Contract Specialist was to be a member of that team, id. at 3127; and that the team would provide the Contracting Officer with its evaluation, id. at 3133.  However, the administrative record does not include any such evaluation distinct from what appears in the Source Selection Authority's Business Clearance Memorandum.  Further, the summary of the price evaluation included in the Source Selection Authority's Business Clearance Memorandum does not indicate who performed the evaluation.  See id. at 3227-32.  During oral argument, defendant described the price evaluation process and identified the individuals who performed various steps of the evaluation but did not, as the court requested, indicate where in the administrative record that information was located.  See Oral Argument at 1:21:10-1:21:40.  Rather, defendant referred to portions of the Source Selection Authority's Business Clearance Memorandum that identified the procurement's "Points of Contact" and presented the price evaluation.  See id. (citing AR 3177, 3227-33).

[8]  "[T]he HUBZone Program . . . provide[s] Federal contracting assistance for qualified small business concerns located in historically underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in those areas."  FAR 19.1301(b).  For "acquisitions conducted using full and open competition," procuring agencies are required to "give offers from HUBZone small business concerns a price evaluation preference by adding a factor of 10 percent to all offers" except "[o]ffers from HUBZone small

| Offeror | Total Contract Award Price | Total Evaluated Price | HUBZone Price |
|---|---|---|---|
| [. . .] | $[. . .] | $[. . .] | $[. . .] |
| [. . .] | $[. . .] | $[. . .] | $[. . .] |
| MTC | $117,742,832.48 | $121,899,636.18 | $134,089,599.80 |
| Odle | $ 98,946,420.08 | $100,996,715.74 | $111,096,387.31 |
| [. . .] | $[. . .] | $[. . .] | $[. . .] |
| [. . .] | $[. . .] | $[. . .] | $[. . .] |

Id. at 4, 3227-28, 3241.  They also noted an Independent Government Cost Estimate ("IGCE") of $[. . .] as a basis for comparison.  Id. at 3228.  However, this IGCE cannot be compared to either the Total Contract Award Prices or the Total Evaluated Prices:  It includes (1) all of the contract line items except for the 1% management fee and (2) an amount representing the cost of a six-month contract extension, while the Total Contract Award Prices consist of all contract line items (including the phase-in, phase-out, and cost-reimbursement items) and the Total Evaluated Prices consist of (1) all contract line items except for the phase-in and cost-reimbursement items and (2) an amount representing the cost of a six-month contract extension.  Id. at 3227-28.  A separate IGCE of $[. . .], referenced by the Source Selection Authority in the Source Selection Decision section of her Business Clearance Memorandum, included the same components as the Total Evaluated Prices.  See id. at 4, 3241.

Based on their comparisons of the proposed prices, the evaluators concluded that "there was adequate price competition to establish a fair and reasonable price" since, as described in FAR 15.404-1(b)(2)(i), "two or more responsible offerors, competing independently, submitted priced offers that satisfy the Government's expressed requirements."  Id. at 3227.

Second, the evaluators analyzed the offerors' Professional Staff Compensation Plans.  Id. at 3229-32.  For each offeror, they provided a table in which they identified between eight and ten "professional positions" and the associated "proposed salaries" that the offeror purportedly listed in "its Staff Salary and Compensation Report,"[9] along with the "average base salaries" in Albany, Georgia, for those positions [. . .].  Id.  Then, in a short paragraph, they describe the sources for the offeror's proposed salaries, assert that they compared the proposed salaries with the salaries [. . .], and state their conclusion.  Id.  The conclusion was identical for each offeror (except for the offerors' names):  "Based on the results of that comparison and the salary data for the categories/positions proposed by [the offeror], the proposed salaries are in line with the average base salary range for the geographical region of Albany, Georgia."  Id. at 3229-32.

---

business concerns that have not waived the evaluation preference" or "[o]therwise successful offers from small business concerns."  FAR 19.1307.

[9] With a single exception, none of the "professional positions" and "proposed salaries" identified by the evaluators for Odle appeared in Odle's Professional Staff Compensation Plan.  Compare AR 2767-69 (Odle's Professional Staff Compensation Plan), with id. at 3230-31 (evaluation).

**C.  Best Value Determination, Source Selection Decision, and Contract Award**

After summarizing the evaluation results, the Source Selection Authority turned to the task of determining which offeror's proposal provided the best value to the government.  At the outset of the Best Value Determination section of her Business Clearance Memorandum, she wrote:

> The Government has assessed the strengths and weaknesses amongst the offerors who were fully responsive to the solicitation and has determined that the proposal submitted by Odle Management Group represents the best value and the award of the Turner Job Corps Center with Outreach and Admissions & Career Transition Services contract to Odle Management Group LLC[] is in the Government's best interest.

Id. at 3233.  She continued by indicating the number of strengths and weaknesses each proposal received under the Technical Approach and Staff Resources factors and subfactors, the Satisfactory rating received by all of the offerors for the Past Performance factor, each offeror's Total Evaluated Price, and the Pass rating each proposal received for the Phase-In and Phase-Out factor.  Id. at 3233-34.  The Source Selection Authority then presented a table that purported to set forth the adjectival ratings for every factor and subfactor,[10] along with the offerors' Total Evaluated Prices.  Id. at 3234.

Following the table, the Source Selection Authority recounted the ratings, strengths, weaknesses, and Total Evaluated Price of each proposal, starting with [. . .]'s proposal and continuing with the other proposals alphabetically by offeror.  Id. at 3235-40.  She concluded the section for each offeror with a determination of why that offeror's proposal did, or did not, represent the best value to the government:

> [. . .] total evaluated price is the second lowest of offers.  However, [. . .] received a Marginal rating for Staff Resources and with the addition of the 10% Hubzone consideration to the price, the price exceeded that of [. . .].  With all Factors and pricing combined, the overall total evaluated proposal does not benefit nor justify the government paying a premium price [over] that of the awardee (Odle).
>
>      . . . .

---

[10]  The table has three errors:  the Career Pathways subfactor rating for Odle's proposal and the Staff Resources ratings for [. . .]'s and [. . .]'s proposals.  With respect to the former, the Source Selection Authority indicated that Odle's proposal received a Very Good rating instead of the Acceptable rating assigned by the evaluators.  See AR 3163, 3196.  With respect to the latter, the Source Selection Authority indicated that [. . .]'s and [. . .]'s proposals received Acceptable ratings instead of the Marginal ratings assigned by the evaluators.  See id. at 3154, 3174, 3187, 3207.

. . . [. . .]'s total evaluated price is the second highest of all the offers. With the addition of the 10% Hubzone consideration to the price, the price exceeded that of [. . .]. With all Factors and pricing combined, the overall total evaluated proposal does not benefit nor justify the government paying a premium price [over] that of the awardee (Odle).

. . . .

. . . MTC's total evaluated price is the third lowest of all the offers. With the addition of the 10% Hubzone consideration to the price, the price exceeded that of [. . .]. With all Factors and pricing combined, the overall total evaluated proposal does not benefit nor justify the government paying a premium price [over] that of the awardee (Odle).

. . . .

. . . Odle has a total evaluated price of $100,996,715.74, a difference of $[. . .] lower than the second lowest offer of $[. . .] ([. . .]), and $[. . .] lower than the highest offer of $[. . .] ([. . .]). With the addition of the 10% Hubzone consideration to the price, the price was lower than [. . .]'s. With all Factors and pricing combined, Odle's total evaluated price, along with the perceived benefits of [its] technical proposal, offers the best value to the government. The award to Odle is in the best interest of the government.

. . . .

. . . [. . .]'s total evaluated price is the highest of all of the offers. [. . .]'s Subcontracting Plan was not approved. With the addition of the 10% Hubzone consideration to the price, the price exceeded that of [. . .]. With all Factors and pricing combined, the overall total evaluated proposal does not benefit nor justify the government paying a premium price [over] that of the awardee (Odle).

. . . .

. . . [. . .]'s total evaluated price is the third highest of all of the offers. With addition of the 10% Hubzone consideration to the price, Odle's adjusted proposed price of $111,096,387.31 is still the best valued offer to the Government as it is priced $[. . .] below [. . .]'s offer of $[. . .]. [. . .] received a Marginal rating for Staff Resources and with all Factors and pricing combined, the overall total evaluated proposal does not benefit nor justify the government paying a premium price [over] that of the awardee (Odle).

Id. at 3236-40.

After determining that Odle's proposal represented the best value to the government, the Source Selection Authority formally documented that determination in the Source Selection

Decision section of her Business Clearance Memorandum.  Id. at 3240-41.  She began by reiterating the evaluation and contract award criteria set forth in the solicitation.  Id. at 3240.  She then concluded:

> Taking all factors into consideration, including the strengths offered in the most important factor of Technical Approach, the selection of Odle Management Group LLC provides the greatest overall benefit to the Government.  While the ratings for all six offerors were "Acceptable" for Technical Approach, "Satisfactory" for Demonstrated Record of Effectiveness (Past Performance), and "Acceptable" for Staff Resources;[11] with a multitude of strengths, Odle fully demonstrated how [it] will provide staff with a wide variety of tools that will support student success.  Odle is eligible for award and offers the best value to the Government at a significantly lower price than the other offerors.  Therefore, there is no basis for awarding to the other five offerors at the higher price.  Odle's proposal had the lowest total evaluated price of $100,996,715.74, a difference of $[. . .] less than the Government estimate of $[. . .].
>
> An award of [the contract] to Odle Management Group[] is in the best interest of the Government.

Id. at 3241 (footnote added).  The Department of Labor awarded the contract to Odle on February 16, 2022.  Id. at 3269-70.

### D.  MTC's Protests

After it was notified of the contract award to Odle, MTC requested and received a debriefing from the Department of Labor.  Id. at 3382, 3390-93.  It then lodged a protest of the award decision with the Government Accountability Office ("GAO").  Id. at 3398, 3402-17.  During the course of the GAO protest, the Source Selection Authority submitted a supplemental statement of facts related to the Past Performance factor evaluation in which she stated:

> 4.  Odle's past performance submission referred to a subcontracting relationship with a firm named "Paxen," to perform Outreach and Admission ("OA") services.
>
> 5.  Odle's proposal did not identify Paxen as a "major" or "critical" subcontractor.
>
> 6.  OA services are not considered a major or critical aspect of this requirement for purposes of the past performance evaluation.  Though important, OA services are but a small portion of the overall work to be performed under the

---

[11]  As noted above, two of the proposals actually received Marginal ratings for the Staff Resources factor.

solicitation.  And they are secondary to the main service, which is operations of the Job Corps Center.

7.   As such, Paxen's past performance was not relevant to this procurement.

Id. at 3971 (citation omitted).  Ultimately, the GAO determined that some of MTC's allegations did not constitute cognizable grounds for protest and then, on May 10, 2022, denied the remainder of the protest.  Id. at 3997-4003.

MTC filed its protest in this court on May 23, 2022.  In its amended complaint, it articulates six claims for relief:  (1) "Failure to Evaluate Odle's Proposal in Accordance with Solicitation – Compensation Realism"; (2) "Failure to Evaluate Odle's Proposal in Accordance with Solicitation – Price Realism"; (3) "Failure to Evaluate Odle's Proposal in Accordance with Solicitation – Odle Subcontractor Past Performance"; (4) "Failure to Evaluate Odle's Proposal in Accordance with Solicitation – Improper Consideration of Dissimilar Past-Performance Comparators"; (5) "Unreasonable Best-Value Decision"; and (6) "Unequal Treatment of Offerors."  Am. Compl. ¶¶ 35-84.  It requests a declaration that the Department of Labor's award decision was arbitrary, capricious, an abuse of discretion, or not in accordance with the law; an injunction enjoining the commencement of contract performance and directing the reevaluation or resolicitation of proposals; an award of attorney's fees and costs; and any other relief deemed appropriate by the court.  Id. at 18.

In accordance with their proposed schedule and pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), the parties filed and briefed cross-motions for judgment on the administrative record.  The court heard argument on August 15, 2022, and is now prepared to rule.

## II.  DISCUSSION

In ruling on motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the record."  Bannum, 404 F.3d at 1356.

### A.  Legal Standard

The court reviews challenged agency conduct pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010) (providing that a protestor has the "burden of showing that the agency's decision . . . is so plainly unjustified as to lack a rational basis"); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, when engaging in a negotiated procurement, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  And, when a contract is to be awarded on a "best value" basis, contracting officers have "even greater discretion than if the contract were to have been awarded on the basis of cost alone."  Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); accord Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th 994, 997 (Fed. Cir. 2021) (confirming that the prejudice analysis "is always required before setting aside a bid award, regardless of whether the error . . . was arbitrary and capricious action or, instead, a violation of law").  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote, 365 F.3d at 1351 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").  The test for establishing prejudice "is more lenient than showing actual causation, that is, showing that but for the errors [the protestor] would have won the contract."  Bannum, 404 F.3d at 1358.

## B. Jurisdiction and Standing

As a threshold matter, the court possesses jurisdiction to entertain this protest pursuant to 28 U.S.C. § 1491(b)(1), which provides that the United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  In addition, MTC has standing to protest the Department of Labor's award of the contract to Odle.[12]  As an offeror who submitted one of the two highest-rated proposals, MTC is an interested party who has a direct economic interest affected by the contract award and, if its allegations of agency error are accepted as true, is prejudiced by the contract award.  See CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (setting forth the requirements to establish standing in bid protests).

## C. Relevance of Past Performance

Turning to the merits of the protest, the court first addresses MTC's contention regarding the Department of Labor's assessment of the relevance of the offerors' past performance.  It is well settled that a procuring agency's "determination of relevance is owed deference as it is among 'the minutiae of the procurement process,' which . . . court[s] 'will not second guess.'"  Glenn Def. Marine (Asia), PTE Ltd. v. United States, 720 F.3d 901, 911 (Fed. Cir. 2013) (quoting E.W. Bliss, 77 F.3d at 449).  Indeed,

> the determination of whether a particular example of past performance is relevant involves an exercise of discretion that lies particularly within the expertise of the procuring agency.  The agency's subject-matter experts are best suited to determine whether and to what extent the experience reflected in a past performance example instills confidence that the offeror will successfully perform and meet the needs of the agency on the contract at issue.

Tech. Innovation All. LLC v. United States, 149 Fed. Cl. 105, 138 (2020) (collecting cases); see also FAR 15.305(a)(2)(ii) ("The source selection authority shall determine the relevance of similar past performance information.").  However, a court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment.  See Motor Vehicle Mfrs. Ass'n of

---

[12]  Neither defendant nor Odle contest MTC's standing to protest, but the court has the independent obligation to ensure that all jurisdictional requirements have been satisfied.  See PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1241 (Fed. Cir. 2002) ("Jurisdiction is a threshold issue, and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." (citations omitted)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."); accord Juidice v. Vail, 430 U.S. 327, 331 (1977) ("Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III, to seek injunctive relief in the District Court.").

the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (remarking that to survive review under the arbitrary-and-capricious standard, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))); Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (articulating the State Farm standard and observing that "it is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review'" (quoting Camp v. Pitts, 411 U.S. 138, 142-43 (1973))); accord Lab'y Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 652 (2014) (applying the State Farm standard in a bid protest decision).  The GAO applies the same standard:[13]

> Where a protester challenges a past performance evaluation, we will review the evaluation to determine if it was reasonable and consistent with the solicitation's evaluation criteria and procurement statutes and regulations, and to ensure that the agency's rationale is adequately documented.  While, as a general matter, the evaluation of an offeror's past performance is a matter within the discretion of the contracting agency, we will question an agency's evaluation of past performance where it is unreasonable or undocumented.  The agency's evaluation must be sufficiently documented to allow our Office to review the merits of a protest.  Where an agency fails to document or retain evaluation materials, it bears the risk that there may not be adequate supporting rationale in the record for us to conclude that the agency had a reasonable basis for its evaluation conclusions.

Trident Vantage Sys., LLC, B-415944 et al., 2018 CPD ¶ 166 (Comp. Gen. May 1, 2018) (citations and footnote omitted); accord Deloitte Consulting, LLP, B-412125.2 et al., 2016 CPD ¶ 119 (Comp. Gen. Apr. 15, 2016); Arctic Slope Mission Servs., LLC, B-410992.5 et al., 2016 CPD ¶ 39 (Comp. Gen. Jan. 8, 2016).

In the solicitation, the Department of Labor advised offerors that it would conduct the past performance evaluation in two steps:  determining the relevance of an offeror's past performance and then assessing the quality of the past performance it deemed relevant.  For the initial inquiry—the one at issue here—the agency would determine whether projects were similar in size, scope, and complexity to the contemplated Turner Job Corps Center contract.  MTC argues that the Department of Labor improperly deemed all of the offerors' Job Corps center experience to be relevant, ignoring the size and scope constraints set forth in the solicitation.

### 1.  Scope

It appears, from the Source Selection Authority's Business Clearance Memorandum, that the evaluators first considered the scope of the offerors' prior projects to determine what projects

---

[13]  Although they are not binding on this court, the decisions of the GAO, which has expertise in bid protests, are instructive.  See Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011); Centech Grp., 554 F.3d at 1038 n.4; Cutright v. United States, 953 F.2d 619, 622 n.* (Fed. Cir. 1992).

would be considered relevant.  Before addressing the offerors' past performance, the evaluators noted that the scope of the Turner Job Corps Center contract was "Center Operations with Outreach and Admissions and Career Transition Services" and, "[t]herefore, the scope is considered to be relevant when the offeror performed as the prime operator of a contract servicing a Center with Operations, Outreach and Admissions and Career Transition Services." AR 3209.  However, as MTC observes, when assessing each offeror's past performance, the evaluators stated that they considered relevant projects to be (1) contracts to operate a Job Corps center that included Outreach and Admissions and Career Transition Services, (2) standalone contracts to provide Outreach and Admissions and Career Transition Services, and (3) contracts to operate a Job Corps center that did not include Outreach and Admissions and Career Transition Services.  Further, because they apparently considered all three types of contracts to be relevant, their list of "relevant projects" for each offeror did not indicate the contract type for the projects.[14]

As a general proposition, the Department of Labor possessed the discretion to determine the scope of the projects it would consider to be similar to the proposed Turner Job Corps Center contract so as to satisfy the relevancy requirement.  As defendant observes, the agency did not specify in the solicitation what it meant by "similar."  However, once the evaluators defined the scope of the Turner Jobs Corps Center contract as including center operations, Outreach and Admissions, and Career Transition Services, and declared that "the scope is considered to be relevant when the offeror performed as the prime operator of a contract" that included these same three elements, id., it was improper for them to then, without explanation, consider contracts that did not include all three elements to be relevant past performance.

This impropriety has three components.  First, the evaluators deviated from their stated criteria for determining what work was of a similar scope to the work to be performed under the Turner Job Corps Center contract.  By doing so, they did not exercise their discretion in an internally consistent manner.  See Braseth Trucking, LLC v. United States, 124 Fed. Cl. 498, 510 (2015) (requiring a contracting officer to "provide an explanation for [an] exercise of discretion that is coherent and not internally inconsistent").  Second, the evaluators did not explain why they deviated from their stated criteria.  It may be that they decided that their original criteria

---

[14]  MTC contends that two of the projects identified in Odle's past performance evaluation did not involve, prior to 2020, Outreach and Admissions or Career Transition Services.  In support of this contention, it attached to its motion excerpts from the solicitations for the relevant contracts.  Defendant, relying on Axiom Resource Management, Inc. v. United States, 564 F.3d 1374 (Fed. Cir. 2009), objects to any consideration of these documents because they are not part of the administrative record and, in any event, supply facts that are irrelevant to the resolution of the protest.  MTC did not respond to these objections.  Without deciding whether it would be appropriate for the court to consider publicly available solicitations for other Jobs Corps center contracts that were assessed as part of the past performance evaluation at issue here, the court agrees with defendant that it need not consider them.  As explained below, what matters is that the evaluators deemed a contract to operate a Job Corps center that did not include Outreach and Admissions and Career Transition Services to be relevant to this procurement, not that any particular past performance was under such a contract.  Accordingly, the court did not consider the solicitation excerpts attached to MTC's motion.

were overly restrictive or incorrect.[15]  However, it is not for the court to supply a reason when the procuring agency has not provided one.  See State Farm, 463 U.S. at 43.  Third, the evaluators did not explain why they considered contracts involving only center operations or contracts involving only Outreach and Admissions and Career Transition Services to be of a similar scope to the contemplated Turner Jobs Corps Center contract.  Certainly, it is tempting to infer that the evaluators believed that any operations, Outreach and Admissions, or Career Transition Services work was sufficiently similar to the work described in the instant solicitation.  But because the evaluators also stated that only contracts with all three components were similar in scope, such an inference would be purely speculative.  Such speculation is no substitute for a reasoned, agency-supplied explanation.

In short, the Department of Labor's assessment of the scope of the offerors' past performance was arbitrary and capricious.

## 2. Size

The other aspect of the Department of Labor's relevancy determination challenged by MTC is the agency's assessment of similar size.  In the solicitation, "size" is defined as "dollar value or center OBS."  AR 250.  However, as reflected in the Source Selection Authority's Business Clearance Memorandum, the evaluators considered only "center OBS" when assessing the size of an offeror's prior projects.  They noted that the OBS for the Turner Job Corps Center was 732, but did not indicate what OBS would be considered similar enough to 732 to be relevant.  Rather, the evaluators reported the range of OBSs for the Job Corps center contracts they associated with each offeror, as summarized in the following court-created table:

| Offeror | Number of Job Corps Center Contracts | Minimum Center OBS | Maximum Center OBS |
|---------|-------------|-------------|-------------|
| [. . .] | [. . .] | [. . .] | [. . .] |
| [. . .] | [. . .] | [. . .] | [. . .] |
| MTC | 17 | 153 | 1002 |
| Odle | 10 | 186 | 669 |
| [. . .] | [. . .] | [. . .] | [. . .] |
| [. . .] | [. . .] | [. . .] | [. . .] |

They then concluded, without elaboration or analysis, that all of these contracts were relevant.

As noted above, the court cannot effectively review a procurement decision unless the procuring agency provides a clear and satisfactory explanation for the decision that rationally connects its fact findings to its ultimate determination.  Here, the Department of Labor found facts—the center OBSs for the Job Corps contracts associated with each offeror—and made a

---

[15]  It is also possible that there was no actual deviation, and that the apparently differing criteria for determining similar scope was the result of inattentive drafting.  However, defendant does not contend that the inconsistency is merely a drafting error.

determination—deeming the contracts to be similarly sized and therefore relevant to the contemplated Turner Job Corps Center contract—but did not provide a rational connection between the two.  In other words, the agency did not explain how or why a center with a particular OBS was similar in size to the Turner Job Corps Center with an OBS of 732.  Moreover, there is no evidence in the administrative record indicating why a center OBS as low as [. . .], 153, [. . .], [. . .], 186, or [. . .] (the minimum center OBS for each offerors' Job Corps center past performance) is similar in size to the Turner Job Corps Center's OBS of 732.  In short, the Department of Labor's "decisional path" is not "reasonably discernable" from the administrative record.  DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1313-14 (Fed. Cir. 2021) (quoting Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998)).

A number of GAO decisions address situations in which the procuring agency, when evaluating past performance, determined that a project was relevant to the effort being solicited without providing an adequate explanation—or any explanation at all—for that determination.  For example, in U.S. Information Technologies Corp., the solicitation required bidders "to identify at least three projects performed within the past 5 years that were similar in scope and complexity . . . ." B-404357 et al., 2011 CPD ¶ 74 (Comp. Gen. Feb. 2, 2011).  In its evaluation of proposals, the procuring agency stated, "without analysis or discussion," that the awardee "provided relevant past performance examples for itself and each teaming partner." Id.  Upon reviewing the awardee's proposal, the GAO found that the awardee "identified nine past performance projects for its contractor team . . . ." Id.  Two of the projects were "valued at $5.5 million and $5.25 million," two others were valued "at $2.8 million and $2.25 million," and the remaining five were valued between "$50,000 to $1.5 million." Id.  The GAO remarked: "While two of these projects might reasonably be considered similar in size to the approximately $8 million project here, there is no explanation in the record why the remaining projects—which are much smaller in value than the work solicited here—were considered relevant." Id.  It therefore stated that it was "unable to conclude that the agency reasonably found that [the awardee] had identified relevant past performance, as required by the [solicitation]." Id.

The GAO found a relevancy determination in Al Raha Group for Technical Services, Inc., B-411015.2 et al., 2015 CPD ¶ 134 (Comp. Gen. Apr. 22, 2015), to be similarly inadequate.  In that case, the solicitation provided that the procuring agency "would evaluate the scope, magnitude of effort, and complexities for each [past performance] reference" and that "the evaluation would include logistical and programmatic considerations, including but not limited to, the quantity procured, length of effort, complexity of the required delivery timeline, and dollar values of efforts submitted." Id.  However, when determining that one of the awardee's contracts was relevant, the procuring agency's only contemporaneous explanation was the following:  "[T]his contract was determined to be relevant to the . . . work scope, as the [period of performance] was two years and the dollar value was $11.299M." Id. (alteration in original).  The GAO found this statement to be devoid of any "analysis comparing the contract against the [solicitation]'s articulated relevancy criteria," and therefore concluded that the procuring agency "did not adequately evaluate" the contract's relevance. Id.

It reached the same conclusion in Trident Vantage Systems.  In that case, the solicitation provided that only relevant contracts would be considered during the past performance evaluation, and that in assessing the relevance of a contract, the procuring agency "would

evaluate the contract experience to determine its overall relevancy to the [statement of work]" and consider the "contract scope, customer, size, type, length, and role as prime or subcontractor."  2018 CPD ¶ 166.  Notwithstanding this guidance, "the entirety of the contemporaneous evaluation record that discussed relevant experience and past performance" consisted of a briefing provided by the Source Evaluation Board to the Source Selection Authority in which the Board (1) reported, for each "contract[] identified in the offerors' past performance narratives," the "contract number; contract name; customer or agency; contract value; contract type; and role as prime or subcontractor" and then (2) assigned each "contract an overall relevancy rating of either somewhat relevant, relevant, or highly relevant."  Id.  The GAO remarked that the "briefing [was] devoid of any discussion of the scope of the offerors' past performance contracts" and did not "offer a rationale for the relevancy ratings assigned."  Id.  It therefore concluded that "[g]iven the lack of contemporaneous documentation, [it had] insufficient information from which to assess the reasonableness of the agency's past performance evaluation."  Id.

As these GAO decisions reflect, it is not possible to determine whether past performance relevancy assessments are reasonable if the procuring agency has not provided an adequate explanation for those assessments or the administrative record otherwise lacks support for the assessments.  See also Glob. Language Ctr., B-413503.8, 2017 CPD ¶ 238 (Comp. Gen. June 1, 2017) (sustaining the protest because the procuring agency did not "explain how or why it determined that" the awardee's reference contracts with different scopes and values were relevant); Deloitte Consulting, 2016 CPD ¶ 119 ("[T]he agency's contemporaneous documentation is insufficient to permit our office to review the reasonableness of the past performance relevancy evaluation."); KMR, LLC, B-292860, 2003 CPD ¶ 233 (Comp. Gen. Dec. 22, 2003) ("[G]iving due deference to the agency's broad discretion in determining whether a contract is relevant, the agency has not rationally explained, nor does the record indicate, how [the awardee]'s referenced contracts are relevant—that is, are the 'same or similar'—to the effort described in the [solicitation].").  Neither defendant nor Odle offers any legal authority indicating that a procuring agency can dispense with the requirement that the reasonableness of its decisions be apparent from the administrative record.  Instead, they primarily rely on case law emphasizing the indisputable proposition that procuring agencies have great discretion in evaluating past performance when a contract is to be awarded on a best value basis in a negotiated procurement—case law that does not alter a procuring agency's obligation to adequately explain its relevancy determination.  Defendant also relies on Avtel Services, Inc. v. United States, 70 Fed. Cl. 173 (2005), to argue that a protestor's contention that the awardee's prior experience was not similar in size, scope, and complexity to the solicited work amounts to a mere disagreement with the procuring agency's evaluation.  However, in Avtel, the procuring agency actually provided an explanation for its determination that the prior experience was relevant.  See id. at 219 ("The [procuring agency]'s Performance Risk Assessment concluded that the [contract at issue] provided [the awardee] with recent experience, of a logistics and engineering services nature, over contracts of the proper size. . . .  The [procuring agency]'s extensive Performance Risk Assessment on [the awardee] provided a reasonable basis for a [deleted] rating based on past performance of similar work." (final alteration in original)).  No such explanation was provided in this case.

Here, the Department of Labor concluded, without elaboration, that past performance at Job Corps centers with OBSs from [. . .] to [. . .] was relevant to the work being solicited for the Turner Job Corps Center, which has an OBS of 732. There is almost nothing in the administrative record indicating what differences, if any, exist between Job Corps centers of differing OBSs.[16] Do Job Corps centers with lower OBSs offer fewer services, serve a different type or mix of students, serve a smaller geographical area, have smaller campuses, require different staffing arrangements, or have other characteristics distinguishing them from Job Corps centers with higher OBSs? And, if so, would the differences affect the similarity determination? In the absence of such evidence, or an explanation by the Department of Labor, the court has no basis to assess the reasonableness of the agency's relevancy determinations.

### 3. Prejudice

Defendant and Odle argue that to the extent that the Department of Labor erred in its relevancy assessments, MTC was not prejudiced because it benefited from the agency's decision to consider all past performance at Job Corps centers to be relevant. There is an obvious flaw in this argument. Had the Department of Labor—after properly assessing the scope and size aspects of the relevancy inquiry—determined that certain Job Corps center contracts were not sufficiently similar to the proposed Turner Job Corps Center contract to be considered relevant, some (if not all) of the offerors would have less past performance that could be evaluated, and the reduction would not necessarily affect all offerors equally.[17] For example, if the Department of Labor decided that contracts for Job Corps centers with OBSs of less than 450 were not relevant, (1) two of the offerors would not have any relevant past performance, requiring a Past Performance factor rating of Neutral rather than Satisfactory, and (2) other offerors might see their Past Performance factor rating improve if they received better CPARS ratings for their contracts with higher center OBSs. Similarly, if the Department of Labor decided that only contracts that included center operations, Outreach and Admissions, and Career Transition

---

[16] The court identified only one such piece of information. In the evaluation of [. . .]'s proposal on the Staff Resources factor, the technical evaluators stated: "[T]he Turner Job Corps Center includes a residential parent program where a select number of students reside in an apartment building on campus with their young children, which requires additional security than on a typical Job Corps campus." AR 3207.

[17] The two decisions relied upon by Odle for the proposition that errors affecting all offerors equally are not prejudicial are distinguishable. In both of those cases, the protestor and the awardee similarly deviated from the requirements of the solicitation and the procuring agency accepted those deviations. See G4S Secure Integration, LLC v. United States, No. 21-1817C, 2022 WL 211023, at *9 (Fed. Cl. Jan. 24, 2022) (unpublished opinion), appeal docketed, No. 22-1513 (Fed. Cir. Mar. 8, 2022); VS2, LLC v. United States, 155 Fed. Cl. 738, 768 (2021). In this case, however, there is no suggestion that the offerors deviated from the solicitation's requirements; they were entitled to identify whatever past performance they believed to be relevant to the proposed Turner Job Corps Center contract. The Department of Labor was solely and independently responsible for determining what past performance was relevant. Moreover, unlike in G4S Secure Integration, any change that the Department of Labor makes in the criteria it uses to assess relevance might impact its evaluation of each proposal in a different manner.

Services were relevant, and an offerors' past performance did not include any such contracts, then that offeror would be rated Neutral, not Satisfactory, for the Past Performance factor.[18] And, on the flip side, if the Department of Labor altered its relevancy criteria in a manner that would eliminate some of MTC's prior contracts from consideration, it is possible that MTC's rating on the Past Performance factor would improve from its current Satisfactory rating since all of its CPARS ratings for Job Corps contracts with higher OBSs were Satisfactory or better.  See AR 3217-19.

Since the administrative record does not reflect where the Department of Labor might draw the line between relevant and irrelevant, or how that line might affect its evaluation of the proposals (including Odle's proposal, which otherwise received the same nonprice adjectival ratings as MTC's proposal), the court cannot conclude that MTC did not have a substantial chance of being awarded the contract had the agency properly conducted its relevancy assessment.  MTC was therefore prejudiced by the agency's errors.

### D.  Subcontractor Past Performance

MTC's next contention is that the Department of Labor did not adhere to the solicitation's requirements for evaluating subcontractor past performance.  It is undisputed that a procuring agency's evaluation of proposals "should be consistent with the factors, subfactors and procedures outlined in the solicitation."  L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 653 (2008); accord FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").  And, if the evaluation "significantly differs from the evaluation process disclosed in the solicitation, the agency's decision can be found to lack a rational basis." 360Training.com, Inc. v. United States, 106 Fed. Cl. 177, 184 (2012).

MTC's challenge is based on the following sentence from the solicitation:  "The Government will consider Past Performance information for the entity proposed as the prime

---

[18]  If the Department of Labor considered relevant only contracts at Job Corps centers with OBSs greater than 450 that involved center operations, Outreach and Admissions, and Career Transition Services, then Odle's relevant past performance might include only a single contract—the Pittsburgh Job Corps Center contract.  See AR 2695, 2699.  If so, Odle might avoid receiving a Neutral rating for the Past Performance factor.  See id. at 259 (indicating, in the solicitation, that "[i]n accordance with the [FAR], an offeror without a record of relevant past performance . . . will receive a Neutral rating"), 3210 (indicating, in the Source Selection Authority's Business Clearance Memorandum, that a Neutral rating indicates that there is no past performance record).  But see id. at 3131 (indicating, in the Source Selection Plan, that a Neutral rating could be assigned—in accordance with FAR 15.305(a)(2)(iv)—to "an offeror without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned"); FAR 15.305(a)(2)(iv) ("In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned, the offeror may not be evaluated favorably or unfavorably on past performance.").

contractor, as well as information for proposed subcontractors that will perform major or critical aspects of the requirement, when such information is relevant to this procurement." AR 259. Defendant contends that this sentence does not impose an obligation on the Department of Labor to evaluate qualifying subcontractor past performance, and that when read in context with the sentence that follows ("However, greater emphasis may be placed on the past performance of the prime contractor."), it is clear that the agency possessed the discretion not to conduct such an evaluation. Defendant's interpretation is strained in two respects.

First, by using the word "will," the Department of Labor represented that it would consider the described subcontractor past performance information. It did not qualify this representation by stating that it would only consider information concerning subcontractors that were expressly designated by offerors as performing "major" or "critical" work,[19] or by providing that it would only consider such information if supplied by the offeror. "Will consider" means just that. Second, the Department of Labor's representation that it reserved the right to place greater emphasis on the past performance of the primary contractor does not extinguish the obligation to consider subcontractor past performance in the first instance. Rather, the agency was merely stating that it would assign whatever weight to subcontractor past performance it believed was appropriate.

In short, the Department of Labor obligated itself to consider relevant past performance information for "proposed subcontractors that [would] perform major or critical aspects of the [Turner Job Corps Center] requirement . . . ." Id. MTC contends that the Department of Labor violated this provision by not considering the past performance of Paxen, the subcontractor designated by Odle to perform Outreach and Admissions, despite Outreach and Admissions being a major or critical component of the services solicited by the agency. Defendant and Odle dispute MTC's characterization of Outreach and Admissions as major or critical, relying on a sentence from the sworn statement made by the Source Selection Authority to the GAO:

> [Outreach and Admissions] services are not considered a major or critical aspect
> of this requirement for purposes of the past performance evaluation. Though
> important, [Outreach and Admissions] services are but a small portion of the

---

[19] That offerors were not required to identify past performance that specifically related to Outreach and Admissions, as defendant observes, does not eliminate the Department of Labor's obligation to consider past performance information for subcontractors that are proposed to perform Outreach and Admissions work if, as the court finds below, that work is "major or critical." Indeed, the Department of Labor advised offerors in the solicitation that it would rely on sources of information outside of the proposals to assess the quality of the offerors' past performance, see AR 258, and did, in fact, evaluate past performance on contracts that were not identified in the offerors' proposals, compare id. at 2192-95 ([. . .] proposal identifying five contracts), 2699 (Odle proposal identifying nine contracts), with id. at 3211-13 (evaluating fourteen contracts for [. . .]), 3221-22 (evaluating eleven contracts for Odle). Moreover, contrary to defendant's suggestion, the Department of Labor's statement that its evaluation would "include consideration of" offerors' past performance doing the work described in the Workforce Innovation and Opportunity Act, see id. at 258, does not mean that the agency would not, or could not, consider past performance doing other work described in the solicitation.

overall work to be performed under the solicitation.  And they are <u>secondary</u> to the main service, which is operations of the Job Corps Center.[20]

<u>Id.</u> at 3971 (emphasis and footnote added).

It is difficult to reconcile defendant's and Odle's position, and the Source Selection Authority's statement, with the plain language of the solicitation.  Throughout the solicitation, the Department of Labor stated that it sought to award a contract to provide three types of services at the Turner Job Corps Center:  operation of the center, Outreach and Admissions, and Career Transition Services.  <u>See, e.g.</u>, <u>id.</u> at 174 (Standard Form 33), 176 (background), 177-80 (contract line items), 182-87 (statement of work), 190 (period of performance), 251 (Staff Resources proposal requirements).  It also stated that in evaluating the proposals under the Technical Approach factor, it would consider the five subfactors (including Outreach and Admissions) as "relatively equal in importance to each other," making the Outreach and Admissions rating worth approximately 20% of the most important factor.  <u>Id.</u> at 258. Furthermore, it indicated that there would be financial penalties for failing to maintain the required OBS (in other words, to recruit and admit a sufficient number of students).  And, it incorporated into the solicitation its Policy and Requirements Handbook, which states that Outreach and Admissions providers perform the following tasks:

- "receive and respond to prospective applicants, inform them about Job Corps training and education programs and center life, and assess applicants' likelihood of success";

- "process applications consistent with applicable law and policy requirements, keep applicants informed of their status, and report to federal managers on detailed information regarding the status of applicants during each phase of the admissions process"; and

- "work cooperatively with a multitude of organizations in order to promote referrals of Job Corps applicants; introduce students to all aspects of center life and center education and training opportunities; interact with the applicants in accordance with applicable law and Job Corps policy requirements; assist applicants with career planning; advise applicants of admissions determination; and coordinate applicants' arrival on centers among other responsibilities."

Office of Job Corps, U.S. Dep't of Labor, Policy and Requirements Handbook § 1.0 (June 17, 2022).

---

[20] This sentence does not constitute a relevancy determination, as defendant suggests. Rather, the Source Selection Authority is commenting on whether Outreach and Admissions work was "major or critical" such that the Department of Labor was required to assess whether any past performance of the subcontractors proposed to do this work was relevant (and therefore to be considered as part of its evaluation under the Past Performance factor).

While the Outreach and Admissions work might not be considered "major" because of the expectation that the contractor would not be required to devote significant resources to satisfy its Outreach and Admissions obligations, it is certainly a "critical" aspect of the Turner Job Corps Center contract requirements.[21]  The Department of Labor would not award the contract to an offeror that did not include Outreach and Admissions in its proposal, and the recruitment and admission of students was vital to a contractor's ability to maintain the required OBS of 732.  It is unclear how a contractor could perform the work described in the solicitation's statement of work without providing Outreach and Admissions services.  Thus, Outreach and Admissions meets the definition of "critical."  The contention of defendant, Odle, and the Source Selection Authority otherwise is contrary to the solicitation.[22]

In its proposal, Odle indicated that Outreach and Admissions would be performed by Paxen, a subcontractor.  Because this work is a "critical aspect[] of the requirement," the Department of Labor was required to evaluate Paxen's relevant past performance.  However, there is no evidence in the administrative record indicating that the Department of Labor sought or obtained any past performance information for Paxen as it did for the six primary offerors; indeed, Paxen is not mentioned anywhere in the Source Selection Authority's Business Clearance Memorandum.  The agency's failure to adhere to the solicitation's requirements for evaluating past performance is arbitrary and capricious.

Furthermore, MTC was prejudiced by the Department of Labor's failure to address Paxen's past performance.  Odle represents in its proposal that Paxen has [. . .] and [. . .].  AR 2695.  Consequently, the Department of Labor might have been able to obtain past performance information for Paxen, deem that information to be relevant, and then assess the quality of Paxen's past performance.  And, if it was able to identify relevant past performance information for Paxen, and that information was generally negative, then Odle's Past Performance rating may have been adversely affected such that Odle would have been seen as a riskier choice than MTC.

---

[21]  The phrase "major or critical" is not defined in the solicitation.  Thus, the assessment of whether "an aspect of the requirement" is "major or critical" can involve an examination of dollar values, personnel assignments, the percentage of work, and/or the type of work.  See, e.g., Am. Auto Logistics, LP v. United States, 117 Fed. Cl. 137, 197 (2014) (remarking that "the term 'major' refers to an 'aspect' of the work to be provided, not just a price or dollar value calculation"), aff'd, 599 F. App'x 958 (Fed. Cir. 2015); Info. Tech. & Applications Corp. v. United States, 51 Fed. Cl. 340, 352 (2001) (providing that "the percentage of the work proposed to be performed is one consideration and not the dispositive factor in determining whether the proposed effort of the subcontractor is a major or critical aspect of the work"), aff'd, 316 F.3d 1312 (Fed. Cir. 2003).  Moreover, "major" and "critical" mean different things.  "Major" refers to something that is "[g]reat in scope and effect" or "[g]reat in number, size, or extent[.]"  Major, The American Heritage College Dictionary (4th ed. 2004).  "Critical," in contrast, refers to something that is "[i]ndispensable; essential."  Critical, id.

[22]  Because the Source Selection Authority's statement conflicts with the plain language of the solicitation, the court need not decide, as a threshold matter, whether it is appropriate to consider that statement, which was prepared during the GAO protest.

Of course, none of this may be true:  Paxen may not have any past performance that the Department of Labor would deem relevant or Paxen may have a stellar past performance record. But because the Department of Labor did not attempt to assess Paxen's past performance, and because MTC and Odle were the two highest-rated offerors (with MTC proposing the third-lowest price), the court must conclude that MTC would have a substantial chance of being awarded the contract if the Department of Labor had adhered to the process set forth in the solicitation.[23]

### E.  Unequal Treatment

MTC next argues that in evaluating the proposals on the Staff Resources factor, the Department of Labor identified weaknesses in [. . .]'s and [. . .]'s proposals but ignored the same, or almost identical, weaknesses in Odle's proposal.  It is well established that procuring agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria."  Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003) (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000)), aff'd, 365 F.3d at 1345; see also PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004) ("[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."), aff'd, 389 F.3d 1219 (Fed. Cir. 2004).  However, to prevail on a disparate treatment claim involving the subjective evaluation of proposals, a protestor must show that its proposal was "'substantively indistinguishable' or nearly identical" to a competitor's proposal but was evaluated differently.  Off. Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 516 (2007)); accord Ascendant Servs., LLC v. United States, 160 Fed. Cl. 275, 291 (2022) ("[T]the inquiry on a disparate evaluation claim is the same whether the disparate evaluation involves a strength, weakness, or deficiency:  the Court is examining whether there is something in the protestor's proposal that is different from one or more other proposals that is rated higher.").  However, "[w]hen a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for the purposes of the evaluation, then the exercise crosses the line and involves the second guessing of 'minutiae' which [courts] are not allowed to undertake."  Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 588 (2017) (quoting E.W. Bliss, 77 F.3d at 449).

---

[23]  To the extent that Paxen lacks any past performance relevant to Outreach and Admissions, the court disagrees with plaintiff that the Department of Labor would be required to assign Odle a Neutral rating for the Past Performance factor.  It appears that Odle itself has Outreach and Admissions experience, and because Odle is ultimately responsible for performing the work required by the contract, the Department of Labor was permitted to evaluate that experience.  However, because the Department of Labor did not consider whether Paxen had any relevant past performance, because the quality of any such past performance is unknown, and because the agency's assessment of past performance relevance was inadequate, it is not possible to conclude on the existing administrative record that Odle's Satisfactory rating for the Past Performance factor is reasonable.

Here, MTC does not allege that the Department of Labor evaluated its proposal differently from the proposals submitted by Odle or the other offerors.  Accordingly, its disparate treatment claim does not fall within the parameters described in Office Design.  Moreover, MTC has not supplied any legal authority for the proposition that a protestor can prevail on a claim that the procuring agency disparately evaluated the proposals of the other offerors.[24]  Yet that is the type of claim it advances here.  Specifically, MTC argues that had the Department of Labor assigned the same weaknesses to Odle's proposal as it did to [. . .]'s and [. . .]'s proposals, it would have assigned a lower rating to Odle's proposal on the Staff Resources factor, leading to MTC's proposal being the highest rated overall on the nonprice factors.  As explained by defendant and Odle, there is an obvious flaw in MTC's argument.  If, as MTC alleges, the Department of Labor evaluated the proposals of Odle, [. . .], and [. . .] in a disparate manner, one available remedy would be the retraction of the weaknesses identified in the [. . .] and [. . .] proposals, rather than the assignment of weaknesses to Odle's proposal.  Thus, there would be no downgrade of Odle's proposal such that MTC's proposal would be considered superior on the nonprice factors.  In other words, MTC would not be prejudiced by the Department of Labor's purported disparate treatment.  Accord Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 534 (2013) ("Plaintiff cites to no authority, and the court is aware of none, that supports plaintiff's argument that a party not subject to the alleged unequal treatment claims can demonstrate prejudice.").

MTC's disparate treatment argument also fails on its merits.  According to MTC, the Department of Labor evaluated proposals unequally on three topics:  (1) whether offerors proposed an [. . .], (2) the number of proposed security personnel, and (3) the proposed scheduling of security personnel.  First, MTC contends that [. . .]'s proposal was assigned a weakness for [. . .]'s failure to propose an [. . .], but Odle's proposal was not assigned a weakness even though Odle also did not propose an [. . .].  Although Odle's staffing chart did not include

---

[24]  The sole decision that MTC mentions, BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677 (2012), does not support its position.  In BayFirst, the protestor observed that the awardee's proposal was assigned a strength because all of the resumes it provided for its key personnel met the requirements set forth in the solicitation, but that, in fact, four of the resumes did not meet the solicitation's requirements.  Id. at 686.  The court therefore concluded that the assignment of a strength for the awardee's proposal was erroneous.  Id.  Although the court then noted that the procuring agency assigned risks or weaknesses to other offerors' proposals when their submitted resumes did not meet the requirements of the solicitation, this finding was not the basis for the court's ultimate conclusion of disparate treatment:

> [The protestor] was not assigned a strength for Personnel despite having presented resumes with the requisite experience, whereas [the awardee] was assigned a strength for Personnel despite having included resumes that clearly did not meet all requirements.  This constitutes either disparate treatment of offerors, or an irrational evaluation of [the awardee]'s and [the protestor]'s proposals.  The court finds that the . . . ratings for [the awardee] and [the protestor] were arbitrary and capricious.

Id. (citation omitted).

an [. . .], <u>see</u> AR 2713, Odle stated, elsewhere in the Staff Resources section of its proposal, that it would "ensure all contract positions are full, with negotiations conducted well in advance of contract expirations," and that [. . .], <u>id.</u> at 2705; <u>accord id.</u> at 2728. Because the [. . .] proposal did not mention the [. . .] requirement at all, Odle's proposal is substantively distinguishable, rendering it improper for the court to analyze the reason for the Department of Labor's decision to evaluate the proposals differently. See <u>Off. Design</u>, 951 F.3d at 1372.

Second, MTC contends that [. . .]'s proposal was assigned a significant weakness for [. . .] proposing [. . .] security personnel, but Odle's proposal was not assigned a weakness for Odle proposing [. . .] security personnel. Once again, because the two proposals are substantively distinguishable, it would be improper for the court to analyze the reason for the Department of Labor's decision to evaluate the proposals differently. <u>See id.</u> Indeed, it was within the Department of Labor's discretion to draw the line between [. . .] and [. . .] when determining the number of security personnel that are necessary to staff the Turner Job Corps Center. <u>Accord</u> <u>AGMA Sec. Serv., Inc. v. United States</u>, 158 Fed. Cl. 611, 623-24 (2022) (characterizing "[t]he decision where to draw the line" when evaluating proposals as one "committed to the discretion of the agency"). It was also within the agency's discretion not assign any kind of weakness for proposing a number of security personnel that is only [. . .] greater than the number warranting the assignment of a significant weakness.

Third, MTC contends that [. . .]'s proposal was assigned a significant weakness for [. . .] proposing [. . .] security personnel for the night shift three days per week, but Odle's proposal was not similarly assigned a weakness for Odle's proposed staffing of the night shift. However, there are marked differences between [. . .]'s and Odle's proposals. [. . .] proposed [. . .] security personnel for the night shift three days per week, with [. . .] security personnel staffing the night shift on the remaining days. AR 3208. Odle proposed [. . .] security personnel for the night shift four days per week, with [. . .] security personnel staffing the night shift on the remaining days. <u>Id.</u> at 2729. The substantive difference between the two proposals render it improper for the court to analyze the reason for the Department of Labor's decision to evaluate the proposals differently. See <u>Off. Design</u>, 951 F.3d at 1372. Indeed, it was well within the Department of Labor's discretion to determine—as it appears to have done here—that at least [. . .] security personnel were necessary to sufficiently staff the night shift. <u>Accord</u> <u>AGMA Sec. Serv.</u>, 158 Fed. Cl. at 623-24.

In summary, MTC has not alleged a disparate treatment claim cognizable by the court and, even if its disparate treatment claim was cognizable, it would not be successful on its merits. Accordingly, the court must deny MTC's protest as to this claim.

## F. Price Realism

The court also rejects MTC's claim that the Department of Labor departed from the solicitation by failing to conduct a price realism analysis.[25] A "[p]rice realism analysis is done in

---

[25] The methods described in the FAR for ensuring that a proposed price is fair and reasonable include a "cost realism analysis," FAR 15.404-1(d), but not a "price realism analysis," <u>see</u> FAR 15.404-1. However, "in common usage a cost realism analysis performed in

fixed-price acquisitions to determine whether a price is unrealistically low and to what degree, and to figure out why it is low so that risk can be properly assessed." Price Realism: A Primer, supra note 25; accord UnitedHealth Mil. & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529, 554 (2017). A procuring "agency may, at its discretion, provide for the use of a price realism analysis to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit." Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 303 (2011). However, if a solicitation "does not expressly or implicitly require a price realism analysis," a procuring agency is prohibited from conducting one. Id. at 306; accord FAR 15.305(a) (noting that procuring agencies must "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation"); see also UnitedHealth, 132 Fed. Cl. at 554-55 (providing examples of language that has been deemed to require agencies to conduct a price realism analysis in the absence of an express directive in the solicitation).

MTC maintains that the Department of Labor, in accordance with the solicitation, was required to conduct a price realism analysis but failed to do so. This requirement, it contends, is found in the following sentence in section M of the solicitation: "In accordance with FAR 15.404-1, the Government will conduct a price analysis to assess whether the contract price proposed is fair and reasonable." AR 259 (emphasis added). As defendant and Odle argue, this sentence does not create an express or implied obligation to conduct a price realism analysis.

FAR 15.404-1 sets forth a number of proposal analysis techniques that procuring agencies can use "to ensure that the final agreed-to price is fair and reasonable." FAR 15.404-1(a). These techniques include, among others, price analysis, cost analysis, and cost realism analysis. FAR 15.404-1(b)-(d). Price analysis, the technique identified in the solicitation at issue, is "used when certified cost or pricing data are not required," FAR 15.404-1(a)(3), as in this procurement, see AR 245 ("[T]he Government anticipates that this solicitation will result in adequate price competition and therefore will not require offerors to submit Certified Cost or Pricing Data."). Specifically, price analysis is "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit . . . ." FAR 15.404-1(b)(1). "The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price," including "[c]omparison of proposed prices received in response to the solicitation"; "[c]omparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items"; and "[c]omparison of proposed prices with independent Government cost estimates." FAR 15.404-1(b)(2). An analysis of price realism is not one of the enumerated price analysis techniques. See id.

The case law relied upon by MTC does not support its contention that the language in the solicitation requires a price realism analysis. In Afghan American Army Services Corp. v. United States, the issue was not whether a price realism analysis was required, but instead

---

a fixed-price acquisition is called a price realism analysis." Price Realism: A Primer, 28 Nash & Cibinic Rep. NL ¶ 1 (Jan. 2014); see also DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 663 (2010) (explaining what a "price realism analysis" entails).

whether the price realism analysis undertaken by the procuring agency was adequate.  90 Fed. Cl. 341, 355 (2009).  Thus, although the court examined the language of the solicitation upon which the procuring agency's price realism analysis was based, it did not render an opinion as to whether that language required a price realism analysis.  See id. at 357.  Furthermore, the language of the solicitation at issue in that case is quite distinct from the language in the Department of Labor's solicitation.  Compare id. ("The . . . solicitation stated that the agency would 'evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach.'  Proposals that had 'an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration.'  The 'competitive procurement will establish the basis for price reasonableness' and the 'price proposals will be evaluated by comparison of proposed prices received in response to this solicitation.'"), with AR 259 ("[T]he Government will conduct a price analysis to assess whether the contract price proposed is fair and reasonable.").

The language of the solicitation in DMS All-Star, 90 Fed. Cl. at 653, is also substantially different from the language in the Department of Labor's solicitation.  In DMS All-Star, the solicitation provided that "Price/Cost [would] be evaluated using price and/or cost analysis techniques" and that the procuring agency was "interested in proposals that offer[ed] value in meeting the requirements, with an acceptable performance risk, at a fair and reasonable price." Id. at 656.  It also provided:  "A proposal that is unrealistic in terms of technical quality or price will be deemed reflective of an inherent lack of technical competence or indicative of failure to comprehend the complexity and risks of the contractual requirements.  Such proposals may be rejected as unacceptable without further evaluation or discussion.  Id. at 664.  No such language appears in the Department of Labor's solicitation.  Moreover, the issue before the court in DMS All-Star was not whether a price realism analysis was required, but whether the price realism analysis conducted by the procuring agency "was rational and consonant with the solicitation." Id. at 665.

Finally, MTC argues that a price realism analysis must be required because the fact that "[p]roposed Phase-In prices [would] be analyzed for reasonableness only," AR 259, suggests that the remaining components of the offerors' proposed prices would be analyzed for something more than just reasonableness.  Even if the court agreed with MTC's interpretation of this language in isolation, it would not matter because the language must be read in context to understand its meaning.  Here is the language in context:  "To foster competition and create a level field, please note that the Government will not evaluate Phase-In prices when calculating the offeror's total evaluated price.  Proposed Phase-In prices will be analyzed for reasonableness only." Id.  In other words, the Department of Labor was clarifying that although it would determine whether proposed Phase-In prices were reasonable, it would not include an offeror's Phase-In price in the offeror's Total Evaluated Price (because of the likelihood that one offeror— the incumbent contractor—would have no Phase-In costs).  It was not implying that it would analyze the reasonableness of the other components of the offerors' proposed prices any differently.  Accordingly, MTC's argument lacks merit.

The Department of Labor was not required, either expressly or implicitly, to analyze the realism of the offerors' proposed prices.  Rather, it was obligated to determine, through a price

analysis, whether the offerors' proposed prices were fair and reasonable, and it satisfied this obligation by comparing the offerors' proposed prices to each other and to the IGCE.

### G. Professional Compensation

MTC also alleges another error in the Department of Labor's assessment of proposed prices: that the agency's evaluation of the offerors' Professional Staff Compensation Plans violated the FAR and was arbitrary and capricious.

### 1. FAR and Solicitation Requirements

As noted above, FAR 52.222-46, Evaluation of Compensation for Professional Employees, was incorporated by reference into the solicitation.[26]  "The purpose of the review envisioned by this clause is 'to evaluate whether offerors will obtain and keep the quality of professional services needed for adequate contract performance, and to evaluate whether offerors understand the nature of the work to be performed.'"  CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 370 (2010) (quoting Innovative Mgmt., Inc., 2003 CPD ¶ 209 (Comp. Gen. Nov. 7, 2003)); accord FAR 52.222-46(a) (reflecting that the clause is meant to address the "lowering" of professional compensation that may occur when contracts are recompeted, which "can be detrimental in obtaining the quality of professional services needed for adequate contract performance").  Overall, the clause's objective is to ensure "that professional employees" are "properly and fairly compensated."  FAR 52.222-46(a).

In furtherance of this objective, offerors must submit with their proposals "a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract," along with the "data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure."  Id.  "The compensation levels proposed should reflect a clear understanding of work to be performed and should indicate the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mission objectives."  FAR 52.222-46(b).

The procuring agency must then "evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements."  FAR 52.222-46(a).  In particular, its evaluation is to "include an assessment of the offeror's ability to provide uninterrupted high-quality work" and a consideration of the proposed professional compensation's "impact upon recruiting and retention, . . . realism, and . . . consistency with a total plan for compensation."  Id.  Further, when an offeror proposes "compensation levels lower than those of predecessor contractors for the same work," the procuring agency is to evaluate that offeror's plan "on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees" because "lowered

---

[26] "[T]he contracting officer shall insert the provision at 52.222-46, Evaluation of Compensation for Professional Employees, in solicitations for negotiated contracts when the contract amount is expected to exceed $750,000 and services are to be provided which will require meaningful numbers of professional employees."  FAR 22.1103.

compensation for essentially the same professional work may indicate lack of sound management judgment and lack of understanding of the requirement." FAR 52.222-46(b). Ultimately, "[p]rofessional compensation that is unrealistically low or not in reasonable relationship to the various job categories, since it may impair the Contractor's ability to attract and retain competent professional service employees, may be viewed as evidence of failure to comprehend the complexity of the contract requirements." FAR 52.222-46(c).

In the solicitation, the Department of Labor specifically instructed offerors to submit a Professional Staff Compensation Plan and supporting information as part of their Business Management Proposals, and indicated that the term "professional employees" was defined in FAR 22.1102. AR 252. FAR 22.1102, in turn, defines "professional employee" as "any person meeting the definition of 'employee employed in a bona fide . . . professional capacity' given in 29 C.F.R. part 541, and explains that "[t]he term embraces members of those professions having a recognized status based upon acquiring professional knowledge through prolonged study." See also 29 C.F.R. § 541.300 (indicating that an "employee employed in a bona fide professional capacity" includes employees "[w]hose primary duty is the performance of work" that requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" or "invention, imagination, originality or talent in a recognized field of artistic or creative endeavor"). "Examples of these professions include accountancy, actuarial computation, architecture, dentistry, engineering, law, medicine, nursing, pharmacy, the sciences (such as biology, chemistry, and physics[)], and teaching[]." FAR 22.1102.

Finally, the Department of Labor indicated in section M of the solicitation that it would evaluate the Professional Staff Compensation Plans "such that plans indicating unrealistically low professional employee compensation may be assessed adversely as one of the factors considered in making an award." AR 260.

## 2. Adequacy of the Evaluation

MTC raises two issues with the Department of Labor's evaluation of Professional Staff Compensation Plans.[27] First, it contends that the agency did not assess whether the plans satisfied the requirements set forth in FAR 52.222-46(a), in other words, (1) whether they "reflect[] a sound management approach and understanding of the contract requirements"; (2) whether they demonstrate "the offeror's ability to provide uninterrupted high-quality work"; (3) their "impact upon recruiting and retention"; and (4) their "consistency with a total plan for compensation." Second, with respect to the analysis that the Department of Labor did conduct, MTC contends that the agency did not explain why it examined only eight-to-ten positions for each offeror, how it selected those positions, and why it did not analyze the same positions for all offerors.

---

[27] In addition to these issues, MTC complains that the Department of Labor did not explicitly state that it was evaluating the offerors' Professional Staff Compensation Plans but instead referred to each offeror's "Staff Salary and Compensation Report." Although the inaccurate nomenclature is unfortunate, the context of its usage provides no doubt that the Department of Labor was evaluating the offerors' Professional Staff Compensation Plans.

In response, defendant argues that the solicitation's language cabining the effect of the evaluation of Professional Staff Compensation Plans—such that a plan "indicating unrealistically low professional employee compensation may be assessed adversely as one of the factors considered in making an award," AR 260—provided the Department of Labor with the discretion to evaluate the plans by comparing the proposed salaries with the average base salaries for the Albany, Georgia region.[28]  Defendant further contends that MTC has not established that it was prejudiced by the Department of Labor's purported evaluation errors because it does not contend that Odle's Professional Staff Compensation Plan was unrealistic.  Odle, in turn, characterizes the criteria set forth in FAR 52.222-46 as "objectives" and "truisms regarding the <u>purpose</u> for conducting a professional compensation realism analysis but do[] not mandate a particular method as to how to conduct that analysis or that an agency must use . . . 'magic' words in documenting its analysis."  Odle's Cross-Mot. 9 (referring to "sound management approach and understanding of the contract requirements," "impact upon recruiting and retention," "consistency with a total plan for compensation," and "offeror's ability to provide uninterrupted high-quality work").  Consequently, it argues, all that was required of the Department of Labor

---

[28]  In advancing this argument, defendant implies that the Department of Labor was not required to comply with the requirements of FAR 52.222-46 because the solicitation provided other criteria for evaluating professional employee compensation plans.  <u>See, e.g.</u>, Def.'s Cross-Mot. 34 ("MTC argues that [the Department of Labor]'s analysis was not adequate under 'the factors outlined in FAR 52.222-46[.'] However, MTC's argument is premised on a misreading of the [solicitation].  Although Section L of the [solicitation] instructed offerors to submit the information required by FAR 52.222-46, Section M of the [solicitation]—which outlines the evaluation process—only stated that 'Professional Staff Compensation Plan will be evaluated such that plans indicating unrealistically low professional employee compensation may be assessed adversely as one of the factors considered in making an award.'  This vested [the Department of Labor] with discretion as to how to [evaluate the plans]." (quoting AR 260)); Oral Argument at 1:26:20-1:27:00 ("When you take . . . a closer look at the [decision in <u>OMV Medical, Inc. v. United States</u>, 219 F.3d 1337 (Fed. Cir. 2000)], it's very apparent that the Federal Circuit did not conclude that the FAR imposed such a requirement [to compare proposed professional compensation with the compensation being paid by the existing contractor], but rather that the [solicitation] in that case did. . . . [The requirements were] all from the [solicitation] itself.  But no such requirements are present in this [solicitation].").  If defendant so believes, it is mistaken.  FAR 52.222-46 was incorporated by reference into the solicitation and the Department of Labor was required to comply with its terms.  <u>See</u> AR 244 ("This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text."); <u>CRAssociates</u>, 95 Fed. Cl. at 378 ("The [procuring agency]'s failure to comply with [FAR 52.222-46] constituted a departure from the evaluation criteria specified in the solicitation and, correspondingly, a violation of both the FAR and the Competition in Contracting Act.").  Indeed, the solicitation's evaluation criteria and FAR 52.222-46 can coexist.  An analysis performed in compliance with FAR 52.222-46 would result in the determination that an offeror did or did not propose unrealistically low professional employee compensation, which could, pursuant to the solicitation's evaluation criteria, affect the award decision.

was to ensure that the offerors' proposed professional compensation was not unrealistically low or unreasonable, and the agency's evaluation satisfied this requirement.

A review of the requirements of FAR 52.222-46; the solicitation's requirements; the Professional Staff Compensation Plans submitted by [. . .], MTC, and Odle; and the Department of Labor's evaluation of those plans reveals a number of significant deficiencies with the agency's evaluation. As an initial matter, there is no evidence that the Department of Labor—either the evaluators or the Source Selection Authority—compared the offerors' proposed professional compensation to the professional compensation being paid by the incumbent contractor, MTC.[29] The requirement that such a comparison be performed is apparent from the plain language of the clause and confirmed by binding and nonbinding precedent.

FAR 52.222-46(b) provides: "[P]roposals envisioning compensation levels lower than those of predecessor contractors for the same work will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." In other words, if an offeror proposes professional compensation below what is being paid by the existing contractor for the same work, the procuring agency must evaluate whether the offeror could maintain the existing type and quality of work if it was awarded the contract. Logically, a comparison of proposed and existing professional compensation is necessary to determine whether this additional evaluation is necessary.

There is ample legal authority supporting this plain-language reading of FAR 52.222-46(b), starting with <u>OMV Medical</u>. That case concerned a solicitation clause with language strikingly similar to the language in FAR 52.222-46:

> Clause L-95 of the [solicitation] was entitled "Evaluation of
> Compensation for Professional Employees." That clause explained that the

---

[29] This issue, not specifically raised by MTC, came to the court's attention as it reviewed FAR 52.222-46 and the case law relevant to the evaluation of professional employee compensation plans. Because MTC generally challenges the Department of Labor's evaluation of the offerors' Professional Staff Compensation Plans, <u>see</u> Am. Compl. ¶¶ 35-42, the court finds it appropriate to note the agency's failure to comply with any of FAR 52.222-46's requirements. <u>See Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); <u>accord Long Island Sav. Bank, FSB v. United States</u>, 503 F.3d 1234, 1244-45 (Fed. Cir. 2007); <u>cf. Becton Dickinson & Co. v. C.R. Bard, Inc.</u>, 922 F.2d 792, 800 (Fed. Cir. 1990) (explaining that the practice of considering an issue not raised in an opening brief to be waived "is, of course, not governed by a rigid rule but may as a matter of discretion not be adhered to where circumstances indicate that it would result in basically unfair procedure"). Moreover, the court afforded the parties the opportunity to address the issue during oral argument, and they all took advantage of that opportunity. <u>See</u> Order, Aug. 11, 2022 (identifying the issue and directing the parties to address it during oral argument); <u>see, e.g.</u>, Oral Argument at 31:46-34:47 (MTC), 1:21:50-1:29:11 (defendant), 1:42:37-1:44:44 (Odle).

proposed compensation levels would be reviewed to ensure that they reflected "a clear understanding of the work to be performed" and indicated "the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mission objectives."  In addition, clause L-95 explained that proposals with compensation levels lower than those of predecessor contractors for the same work would be evaluated "on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees."

OMV Medical, 219 F.3d at 1339 (emphasis added).  Based on this language, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") concluded that the procuring agency was required to compare proposed and existing professional compensation.  See id. at 1343 (observing that one component of the solicitation clause was "a determination of whether each offeror's compensation package was generally consistent with the salaries being paid by the incumbent contractor," and that this component "was designed to ensure that the incoming contractor would not experience a large turnover in the program workforce because of a significant reduction in salary levels").

The decision in CRAssociates, which concerned FAR 52.222-46, is even more on point.  In that case, the protestor contended that the clause, which was incorporated by reference into the solicitation, required the procuring agency to compare proposed and existing professional compensation.  95 Fed. Cl. at 370.  The court agreed:  "[T]he clause's language certainly infers the need for such a comparison as it requires the agency to perform additional analysis when an offeror's compensation levels are lower than those paid by the incumbent."  Id.; accord id. at 372.  It explained "that the drafters of the FAR intended agencies to perform more analysis when a recompetition of an existing contract occurs, with the obvious goal of promoting a smooth transition from one contract to the next" and, therefore, "an agency is obliged to make the threshold comparison described in [FAR 52.222-46(b)] to determine whether it must conduct the further analysis of compensation plans required only for recompetitions."  Id. at 370-71.  It also asserted that the Federal Circuit's decision in OMV Medical supported its interpretation of FAR 52.222-46(b).  See id. at 371.  See generally Sparksoft Corp. v. United States, 141 Fed. Cl. 609, 624 (2019) (adopting CRAssociates' characterization of OMV Medical as requiring the comparison of proposed and existing professional compensation).

During oral argument, defendant contended that CRAssociates' analysis and conclusions had been undercut by more recent precedent rejecting a protestor's contention that the procuring agency was required to compare proposed and existing professional compensation under the holdings of OMV Medical and CRAssociates.[30]  See Oral Argument at 1:24:31-1:28:29

--------

[30]  Defendant also contended that the requirements in FAR 52.222-46(b) are mere restatements of the requirements in FAR 52.222-46(a).  See, e.g., Oral Argument at 1:22:38-1:22:54.  However, FAR 52.222-46(b)'s requirements are focused specifically on situations in which the procuring agency is recompeting an existing contract, while FAR 52.222-46(a)'s requirements apply to all procurements of professional services.  Accord CRAssociates, 95 Fed. Cl. at 370-71.  In any event, the Department of Labor did not address the factors set forth in either section of FAR 52.222-46.

(discussing <u>CSC Government Solutions LLC v. United States</u>, 129 Fed. Cl. 416, 431-33 (2016), and declaring it to be "more persuasive"); <u>see also id.</u> at 1:43:33-1:44:44 (reflecting Odle's agreement with defendant's position).  The court disagrees.  As is apparent from its own analysis of the clause, the <u>CRAssociates</u> court correctly construed the language of FAR 52.222-46(b) and properly relied on the decision in <u>OMV Medical</u> in support of its construction.

In short, the Department of Labor was required to compare the offerors' proposed professional compensation to the compensation being paid by MTC under the existing contract, but failed to do so.[31]

The Department of Labor also did not address all of the factors set forth in FAR 52.222-46.  The only conclusion reached by the Department of Labor was:  "Based on the results of that comparison and the salary data for the categories/positions proposed by [the offeror], <u>the proposed salaries are in line with the average base salary range for the geographical region of Albany, Georgia.</u>"  AR 3229-32 (emphasis added).  Assuming that this conclusion is accurate (as discussed below, it may not be), the mere fact that "the proposed salaries are in line" with regional salaries does not mean that the proposed salaries reflect a sound management approach or an understanding of the contract requirements.  Moreover, the primary reason for the existence of FAR 52.222-46 is to address the government's concern that the compensation in a follow-on contract would be too low for a contractor to retain or attract competent professional employees.  Proposed salaries that are in line with regional salaries might be insufficient for this purpose if the salaries paid under the existing contract are higher.  <u>Cf.</u> <u>OMV Med.</u>, 219 F.3d at 1343 (remarking that "salary levels [consistent with the Bureau of Labor Statistics' Occupational Outlook Handbook] might still be sufficiently far below the incumbent's salary levels that the incoming contractor would be likely to experience an unacceptably large staff turnover and loss of program continuity").  Indeed, the Department of Labor does not, as required, explain how the offerors' proposed salaries would impact the offerors' ability to retain the existing professional employees or to recruit individuals to fill vacant professional employee positions.  Nor is there any indication that the Department of Labor made any effort to assess whether the offerors' proposed salaries for professional employees were consistent with the offerors' overall compensation plans.  While the Department of Labor was not required to use any particular language in addressing the clause's requirements, it did need to provide an explanation sufficient to indicate that it had considered the requirements in its analysis.  <u>See</u> <u>State Farm</u>, 463 U.S. at 43.

Furthermore, even though the Department of Labor possessed the discretion to determine how, precisely, to evaluate the reasonableness and realism of the offerors' Professional Staff

---

[31]   While it is true that the evaluators and the Source Selection Authority had access to MTC's proposed salaries for the new contract since they were included in MTC's proposal, there is no indication that they sought to ascertain whether MTC's proposed salaries were in line with what MTC was currently paying.  <u>See</u> <u>CRAssociates</u>, 95 Fed. Cl. at 372 ("[T]here is no assurance that the incumbent's compensation plan for the new contract, forged in the face of renewed competition, will provide for the same compensation it is paying on the old contract.").  Moreover, even if they did conclude that MTC's proposed salaries were in line with its existing salaries, the evaluators and the Source Selection Authority failed to compare the other offerors' proposed salaries to MTC's proposed salaries.

Compensation Plans, there is at least one problem with the methodology it used.[32]  The offerors were required to set forth in their plans "salaries and fringe benefits proposed for the professional employees."  The evaluators decided to compare the offerors' proposed salaries with "average base salaries" [. . .].  AR 3229-32.  Presumably, these "average base salaries" did not include fringe benefits (or they would not be "base" salaries).  However, the "proposed salaries" that the evaluators listed for MTC and Odle included fringe benefits.  Compare id. at 2545-53 (MTC's proposed base salaries and total compensation), 2767 (Odle's proposed base salaries and total compensation), with id. at 3230 ("proposed salaries" for MTC and Odle used in the evaluation).  Thus, it is unclear whether the offerors' proposed salaries were, in fact, in line with the regional averages.[33]

---

[32]  A second issue is whether the eight-to-ten positions identified by the Department of Labor for its analysis are, in fact, professional positions. (MTC does not raise this issue, likely because it included the positions evaluated by the agency in its Professional Staff Compensation Plan.)  By regulation, professional employees include "members of those professions having a recognized status based upon acquiring professional knowledge through prolonged study," FAR 22.1102, and, more particularly, are individuals whose work requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" (learned professionals) or "invention, imagination, originality or talent in a recognized field of artistic or creative endeavor" (creative professionals), 29 C.F.R. § 541.300.  The Department of Labor evaluated the salaries of, for example, human resource managers, safety and security managers, and career services managers.  It is unclear whether such positions are encompassed within the regulations' conception of professional employees.  See also 29 C.F.R. § 541.301(b) (indicating that "[t]he phrase 'field of science or learning' includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status").  See generally id. § 541.100(a) (defining "executive employees" as those "[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof," who supervises other employees, and who can hire or fire other employees); id. § 541.200(a) (defining "administrative employees" as those "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and "includes the exercise of discretion and independent judgment with respect to matters of significance").

[33]  In contrast, the "proposed salaries" that the evaluators listed for [. . .] did not include fringe benefits.  Compare AR 2287-96 (setting forth tables reflecting [. . .]'s proposed minimum and maximum salaries, average salaries, average fringe benefits, year one total compensation, and year two total compensation), with id. at 3229 (listing the "proposed salaries" for [. . .] used in the evaluation).  Because the evaluators listed salaries with fringe benefits for some offerors and salaries without fringe benefits for at least one other offeror, the court's analysis would not change if its presumption that "average base salaries" did not include fringe benefits is incorrect.

### 3. Prejudice

There can be no question that the Department of Labor's evaluation of the offerors' Professional Staff Compensation Plans was materially deficient. The agency did not compare the proposed salaries to those of the incumbent contractor, failed to address several required evaluation factors, and used a problematic methodology to assess the reasonableness of the proposed salaries. These errors prejudiced MTC. The price proposed by Odle was much lower than the price proposed by MTC and, according to MTC, lower than what MTC offered in 2016 when it was awarded the incumbent contract. By not complying with FAR 52.222-46, the Department of Labor was unable to ascertain whether the difference in proposed prices was due to "unrealistically low" professional compensation. Had the Department of Labor properly assessed the offerors' Professional Staff Compensation Plans, MTC would have had a substantial chance of being awarded the contract. Accord Sparksoft Corp., 141 Fed. Cl. at 627 ("[The protestor] will suffer prejudice if [the procuring agency] does not perform the analysis required by FAR § 52.222-46. . . . If [the procuring agency] will not conduct a realism analysis on the proffered plans for professional compensation, [the protestor] risks being undercut by [a competing offeror] with a potentially less 'realistic' bid.").

### H. Best Value Determination

MTC's final contention is that the Department of Labor's best value determination was inadequate. In particular, MTC faults the Source Selection Authority for merely describing the proposals' strengths, weaknesses, and adjectival ratings without comparing the proposals head-to-head or explaining why the benefits of MTC's proposal did not justify its higher proposed price. In response, defendant and Odle argue that the best value determination was appropriately documented and reflected a consideration of the proposals' similarities and differences. Defendant further contends that the Source Selection Authority was not required to conduct the tradeoff analysis described by MTC because no proposal received higher adjectival ratings than Odle's proposal and Odle proposed the lowest price. In other words, there was no need to determine whether a higher-priced, higher-rated proposal offered benefits that justified its higher price.

The overarching goal of the competitive acquisition process is the award of a contract that represents the best value to the government. FAR 15.002(b); see also FAR 2.101 ("'Best value' means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement."). In determining which proposal represents the best value, procuring agencies must make "a comparative assessment of proposals against all source selection criteria in the solicitation," FAR 15.308, and may, if necessary, utilize a tradeoff process, FAR 15.101-1. "A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101-1(a). "The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented . . . ." FAR 15.101-1(c); accord FAR 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on . . . , including benefits associated with additional costs."); Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008) (explaining that the

tradeoff process "obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price"). Ultimately, procuring agencies "have substantial discretion to determine which proposal represents the best value for the government." E.W. Bliss, 77 F.3d at 449. And, "where agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

Defendant's and Odle's defense of the Department of Labor's best value determination is premised on their understanding that the agency considered Odle's proposal to be superior than MTC's proposal on the nonprice factors (or that the two proposals were equivalent on those factors) because had the agency considered MTC's proposal to be technically superior, it would have performed a tradeoff analysis. However, nowhere in the Best Value Determination or Source Selection Decision sections of her Business Clearance Memorandum does the Source Selection Authority state that Odle's proposal was the highest-rated proposal on the nonprice factors or that MTC's and Odle's proposals were technically equal. Instead, she summarized the evaluators' findings (noting that the two proposals were assigned the same adjectival ratings for the nonprice factors; noting that neither proposal was assigned any strengths or weaknesses for the Staff Resources factor; and, for the Technical Approach factor, describing some of the six strengths assigned to MTC's proposal and some of the ten strengths and one weakness assigned to Odle's proposal) and concluded that "[t]aking all factors into consideration, including the strengths offered in the most important factor of Technical Approach," Odle's proposal would provide "the greatest overall benefit to the Government."[34] AR 3241; accord id. ("Odle . . . offers the best value to the Government at a significantly lower price than the other offerors. Therefore, there is no basis for awarding to the other five offerors at the higher price.").

The Source Selection Authority's failure to explicitly conclude that Odle's proposal was technically superior (or equivalent) to MTC's proposal makes it more difficult to ascertain whether her source selection decision was a reasonable exercise of her discretion. Nevertheless, the court is able to infer, from two things she did state, that she found Odle's proposal to be superior to MTC's proposal. First, in finding that Odle's proposal represented the best value, she emphasized the strengths assigned for the Technical Approach factor, and Odle's proposal was assigned four more strengths than MTC's proposal. Second, in finding that Odle's proposal "offer[ed] the best value to the Government at a significantly lower price," she distinguished between the nonprice and price factors, thereby suggesting that Odle's proposal was superior on the nonprice factors. Because procuring agencies "have substantial discretion to determine which proposal represents the best value for the government," E.W. Bliss, 77 F.3d at 449, the

---

[34] Contrary to the suggestions of defendant and Odle, the Source Selection Authority included no discussion of the Past Performance factor evaluations in her best value determination; she merely noted that each offeror was rated Satisfactory on that factor. See AR 3233-41.

court must conclude that the Source Selection Authority's best value determination—assuming that there were no errors in the underlying evaluation process—was reasonable.[35]

Of course, the court has determined that the Department of Labor made a number of errors in its evaluation of the offerors' proposals. Its assessment of the scope of the offerors' past performance was arbitrary and capricious; it did not adequately document its determination that different-sized Job Corps centers could be considered sufficiently similar to the Turner Job Corps Center for relevancy purposes; its failure to evaluate Paxen's past performance was arbitrary and capricious; and its evaluation of the offerors' Professional Staff Compensation Plans was materially deficient.[36] Accordingly, to the extent that the Department of Labor is required to reevaluate proposals as a result of this protest, the current best value determination will no longer be operative.

## I. Injunctive Relief

Because MTC has established the existence of significant, prejudicial procurement errors, the court must address whether MTC is entitled to injunctive relief.[37] The United States Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by RCFC 65. In determining whether to issue a

---

[35] In so holding, the court rejects MTC's contention that the Source Selection Authority's misstatement of the Staff Resources ratings for [. . .]'s and [. . .]'s proposals in the Source Selection Decision section of her Business Clearance Memorandum indicates that her best value determination was based on a misunderstanding of the ratings assigned to the proposals. As Odle observes, these errors could not prejudice MTC because they would not have affected any tradeoff between MTC's and Odle's proposals.

[36] The court concluded that each of these errors was independently prejudicial to MTC. Taken together, it is even more evident that MTC was prejudiced by the Department of Labor's evaluation errors. Accord CRAssociates, 95 Fed. Cl. at 390 ("Given the range and depth of the errors found here, it requires little to conclude that plaintiff was prejudiced by the [procuring agency]'s conduct of this procurement . . . . The correction of these errors undoubtedly could lead to significant fluctuations in both technical ratings and price, paving the way for plaintiff to receive an award of the contract. This leaves the court with the firm conviction that the combined impact of the errors encountered here clearly prejudiced plaintiff.").

[37] One error—the Department of Labor's failure to adequately document its determination that different-sized Job Corps centers could be considered sufficiently similar to the Turner Job Corps Center for relevancy purposes—could be remedied by a remand of the protest to the agency. See CRAssociates, 95 Fed. Cl. at 384 ("[I]f the record before the court precludes a determination as to whether 'the procurement official's decision lacked a rational basis . . . or . . . the procurement procedure involved a violation of regulation or procedure,' and the claimed error, alone or in combination, appears prejudicial, the court must remand the matter to the agency to allow it to supply, in the first instance, the missing explanation." (quoting Impresa, 238 F.3d at 1332)). However, the existence of several other errors for which remand is not appropriate renders remand insufficient as a remedy.

permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. PGBA, 389 F.3d at 1228-29.  The protestor bears the burden of establishing the factors by a preponderance of the evidence. Lab'y Corp. of Am., 116 Fed. Cl. at 654; Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).  None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).[38]  Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief. Id.  The award of injunctive relief is within the discretion of the court. See Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) ("We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing its decision if it abused its discretion.").

MTC has succeeded on the merits of its protest.  Therefore, the court turns to the remaining injunctive relief factors.

## 1.  Irreparable Injury

With respect to the irreparable injury factor, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993); see also Younger v. Harris, 401 U.S. 37, 43-44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief").  MTC contends that it will be harmed absent a permanent injunction because it will have lost the opportunity to fairly compete for the Turner Job Corps Center contract.  This court has recognized that a lost opportunity to compete for a contract can be sufficient, on its own, to constitute an irreparable injury. Hosp. Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618, 624 (2005), cited in Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1383 (Fed. Cir. 2012).  Normally, attorney argument is insufficient to establish an irreparable injury. See, e.g., Intelligent Waves, LLC v. United States, 135 Fed. Cl. 299, 314 (2017); Totolo/King v. United States, 87 Fed. Cl. 680, 693 (2009), appeal dismissed and remanded sub nom. Totolo/King Joint Venture v. United States, 431 F. App'x 895 (Fed. Cir. 2011) (per curiam); Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009); cf. Obsidian Sols. Grp., LLC v. United States, No. 20-1602C, 2021 WL 1688892, at *4 (Fed. Cl. Apr. 27, 2021) (unpublished opinion) (holding that a party cannot rely solely on "the unsupported assertions of its attorney in a memorandum of law" to establish that "it will suffer irreparable harm in the absence of a stay").  However, as the incumbent contractor, MTC presumably submitted a proposal with the expectation of making a profit (as opposed to submitting a lower-priced offer to gain a toehold in the industry), and there can be no dispute that a lost opportunity

---

[38]  Although FMC Corp. concerns the award of a preliminary injunction, 3 F.3d at 427, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

to compete for a contract forecloses a contractor's ability to gain the experience associated with performing the contract, which has value when competing in future procurements. Consequently, MTC has established irreparable injury.

## 2. Balance of Harms

In addition to considering whether a protestor would suffer an irreparable injury absent a permanent injunction, "the court must weigh the irreparable harm plaintiff would suffer without an injunction against the harm an injunction would inflict on defendant and defendant-intervenor." Progressive Indus., Inc. v. United States, 129 Fed. Cl. 457, 485 (2016). A delay in implementing the new contract or in arranging for an alternative means to acquire the goods or services at issue while complying with the terms of the injunction, absent exceptional circumstances, does not "warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 716 (2006) (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)). Further, although the government would bear the cost of reprocurement, such costs do not necessarily tilt the balance of harm in the government's favor. See, e.g., Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 195 (2015); Huntsville Times Co. v. United States, 98 Fed. Cl. 100, 122 (2011).

MTC contends that there are no exceptional circumstances rendering any delay caused by an injunction to be harmful to the Department of Labor. It further argues that an injunction would not create a gap in services at the Turner Job Corps Center because those services are being provided under the incumbent contract. Defendant, in response, contends that the Department of Labor would be harmed by an injunction "because ordering reprocurement would unnecessarily result in the expenditure of Government funds and resources and would unnecessarily intrude upon the [Source Selection Authority]'s discretion." Def.'s Cross-Mot. 41. Odle does not allege that it would suffer any harm from the imposition of an injunction.

The harms that defendant claims would flow from the issuance of an injunction do not outweigh the harms that MTC would suffer in the absence of an injunction. The costs that the Department of Labor might incur to reprocure the contract—which defendant does not identify or quantify—are the direct result of the agency's failure to conduct a fair competition and are not greater than the harms suffered by MTC due to the lack of a fair competition. Further, if the Source Selection Authority did not properly exercise her discretion in awarding the contract, then the court is not intruding on her discretion by requiring her to take corrective action. In short, the balance of harms tips in MTC's favor.

## 3. Public Interest

Finally, when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). There is no dispute that "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations." Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010). Although "there is a countervailing public interest in minimizing disruption" to the

procuring agency, <u>Heritage of Am., LLC v. United States</u>, 77 Fed. Cl. 66, 80 (2007), defendant does not explain how the Department of Labor would be disrupted by properly evaluating the proposals in this procurement. Rather, both defendant and Odle maintain that the public interest lies in allowing Odle to proceed with its performance of a contract that was awarded after a properly conducted competition.

Of course, as explained in detail above, the Department of Labor did not properly conduct the competition. Indeed, MTC contends that the Department of Labor's failure to adhere to procurement regulations is sufficient to satisfy the public interest factor. It also contends that absent an injunction, its existing staff at the Turner Job Corps Center "would face substantial uncertainty about their continued employment," potentially leading to the departure of key staff and the "destabiliz[ation of] a residential educational facility that serves hundreds of at-risk youth . . . ." MTC's Mot. 32. The court finds this latter contention unpersuasive. The center's existing staff would face the same uncertainty if the contract was properly awarded to another offeror, and because such an award would be in the government's best interest, it almost necessarily would be in the public interest. However, MTC is correct, and defendant and Odle do not dispute, that the public has an interest in preserving the integrity of the procurement process. On this basis, the public interest factor weighs in MTC's favor.

### 4.  Summary

In sum, in addition to prevailing on the merits of its protest, MTC has established that it will suffer irreparable harm if the court withholds injunctive relief, that the balance of harms tips in its favor, and that an award of injunctive relief is in the public interest. Thus, the issuance of a permanent injunction is warranted.

### III.  CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** MTC's motion for judgment on the administrative record and **GRANTS IN PART** and **DENIES IN PART** defendant's and Odle's cross-motions for judgment on the administrative record. MTC is entitled to injunctive relief. The Department of Labor

- is **ENJOINED** from continuing performance on the contract awarded to Odle pursuant to the solicitation at issue,

- shall **CANCEL** the contract awarded to Odle, and

- is **ENJOINED** from awarding a new contract under the solicitation at issue unless it reevaluates the proposals in accordance with the provisions of the solicitation.

The clerk shall enter judgment in favor of MTC, consistent with this opinion.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, by **no later than Thursday, September 1, 2022**, the parties shall

file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

**IT IS SO ORDERED.**

<u>s/ Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Senior Judge